SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| OASIS INVESTMENTS II MASTER FUND LTD., derivatively on behalf of nominal defendant FANG HOLDINGS LIMITED,<br><br>                                   Plaintiff,<br><br>                  -against-<br><br>VINCENT TIANQUAN MO, RICHARD JIANGONG DAI, ACE SMART INVESTMENTS LIMITED, NEXT DECADE INVESTMENTS LIMITED, MEDIA PARTNER TECHNOLOGY LIMITED, and TRUE KNIGHT LIMITED,<br><br>                              Defendants. | Index No.: 652607/2023<br><br>**Hon. Andrew Borrok**<br><br>**SUBPOENA *DUCES TECUM*** |

To:    507 Summit LLC
        853 Broadway, Suite 1109
        New York, NY 10003
        Attn: Lepercq De Neuflize Asset Management LLC
        Phone: 212-698-0700

YOU ARE HEREBY COMMANDED TO PRODUCE, pursuant to Articles 23 and 31 of the Civil Practice Law and Rules ("**CPLR**"), on or before May 30, 2025, at 10:00 A.M., at the offices of Balance Law Firm at One World Trade Center, Suite 8500, New York, New York 10007, for inspection, copying, testing, or sampling, in connection with the above-captioned case, pending in the Supreme Court of the State of New York, New York County, Index No. 652607/2023, complete and accurate copies of all documents and things in your possession, custody, or control that are described in the attached Schedule A (the "**Requests**").

Disclosure is being sought from you because, upon information and belief, you possess documents and things material and necessary to the prosecution or defense of this action. A copy of the Amended Complaint in this action is attached hereto as Exhibit 1.

Business records produced pursuant to this subpoena must be accompanied by a certification, sworn in the form of an affidavit and subscribed by the custodian or other qualified witness charged with responsibility of maintaining the records, stating certain information as set forth in CPLR 3122-a.

In lieu of a personal appearance, you may deliver the material by mail or overnight delivery service, or by electronic means, to the undersigned attorney, so as to be received by the date set forth above.

Failure to comply with this subpoena is punishable as a contempt of Court and shall make you liable to the person on whose behalf this subpoena was issued for a penalty not to exceed fifty dollars and all damages sustained by reason of Your failure to comply.

Dated: May 7, 2025
      New York, New York

                **Balance Law Firm**

                By: s/ *B. Robert Liu*
                B. Robert Liu, Esq.
                One World Trade Center, Suite 8500
                New York, New York 10007

                *Attorneys for Defendants*
                *Vincent Tianquan Mo,*
                *Richard Jiangong Dai, ACE*
                *Smart Investment Limited,*
                *Next Decade Investments*
                *Limited, Media Partner*
                *Technology Limited, and True*
                *Knight Limited, and Nominal*
                *Defendant Fang Holdings*
                *Limited*

**Schedule A**

**Instructions and Definitions**

As used herein, the following terms shall have the meanings indicated below:

"Action" shall refer to the above-captioned proceeding.

"All," "any," and "each" shall each be construed in their most inclusive form as encompassing any and all.

"Amended Complaint" shall refer to the amended complaint filed in the above-captioned proceeding on August 18, 2023 (Exhibit 1).

"Communication(s)" shall mean the transmittal or exchange of information, in any form and by any means, including but not limited to, documents, writings, letters, notes, face-to-face conversations, telephone conversations, meetings, conferences, correspondence, electronic mail, text message, sound recordings, video recordings, instant message, or other exchange of information in any form.

"CIH" shall refer to China Index Holdings Limited.

"Document(s)" is synonymous in meaning and equal in scope to the usage of the term in Article 31 or the N.Y. C.P.L.R., except that "document" specifically includes, without limitation, any electronically-stored data or information. Drafts and non-identical duplicates constitute separate documents. Attachments, exhibits, appendices, schedules, and enclosures to documents are considered part of the same document.

"Evenstar" shall mean Evenstar Master Fund SPC and Evenstar Capital Management Limited, and each and all of their current and former parents, owners, subsidiaries, affiliates, divisions, predecessors, successors, employees, managers, officers, directors, shareholders, partners, general partners, limited partners, members, agents, or any other Person acting, or purporting to act, with or on behalf of any of the foregoing.

"Fang" shall refer to Fang Holdings Limited, the nominal Defendant in the above-captioned proceeding.

"Including" shall mean including but not limited to.

"Koa Capital LP" shall mean Koa Capital LP, a Delaware entity located at 344 Grove Street, Unit 960, Jersey City, New Jersey, 07302, and each and all of their current and former parents, owners, subsidiaries, affiliates, divisions, predecessors, successors, employees, managers, officers, directors, shareholders, partners, general partners, limited partners, members, agents, or any other Person acting, or purporting to act, with or on behalf of any of the foregoing, including but not limited to, Henry Patner, Chief Investment Officer.

"Lepercq Group" shall mean the Lepercq Group located at 853 Broadway, New York, NY 10003, with additional offices located at 14 Hanover Square, #4.02, Mayfair, London W1S 1HP, and at 2 Havelock Road, #07-25, Havelock II, Singapore 059763, including but not limited to, Lepercq de Neuflize Asset Management LLC, a Delaware limited liability company, and Lepercq Capital Management LLC, a Delaware limited liability company, and each and all of their current and former parents, owners, subsidiaries, affiliates, divisions, predecessors, successors, employees, managers, officers, directors, shareholders, partners, general partners, limited partners, members, agents, or any other Person acting, or purporting to act, with or on behalf of any of the foregoing, including but not limited to, Thomas Riboud-Seydoux, Chairman, CEO, Co-Chief Investment Officer and Kyle Cleeton, Co-Chief Investment Officer.

"Lorelei NCC Inc." shall mean Lorelei NCC Inc., a New York entity located at 32 Elm Place, 3rd Floor, Rye, NY 10580, and each and all of their current and former parents, owners, subsidiaries, affiliates, divisions, predecessors, successors, employees, managers, officers, directors, shareholders, partners, general partners, limited partners, members, agents, or any other Person acting, or purporting to act, with or on behalf of any of the foregoing, including but not limited to, Sina Toussi, Chief Executive Officer.

"Oasis Capital Partners (Texas) Inc." shall mean Oasis Capital Partners (Texas) Inc, with its principal office located at 100 Congress Ave, Ste 780, Austin, TX 78701, and with additional offices located at 25/F, LHT Tower, 31 Queen's Road Central, Hong Kong, and at Nan-O Bldg. Shintora 5th Floor, 2-20-1, Nishi-Shinbashi, Minato-Ku, Tokyo, Japan, 105-0003, and at 7 Rival Street, Tel-Aviv-Yafo, Israel, 6777840, and each and all of their current and former parents, owners, subsidiaries, affiliates, divisions, predecessors, successors, employees, managers, officers, directors, shareholders, partners, general partners, limited partners, members, agents, or any other Person acting, or purporting to act, with or on behalf of any of the foregoing.

"Ownership Interest(s)" shall refer to, but not limited to, shares of stocks, equity interests, American Depositary Shares ("ADSs") representing shares of stocks, or American Depositary Receipts ("ADRs") evidencing the ADSs.

"Person(s)" shall include both the singular and the plural, and means any natural person, business entity, corporation, cooperative, public corporation, partnership, joint venture, or organization.

"Plaintiff" shall mean Oasis Investments II Master Fund Ltd., and each and all of their current and former parents, owners, subsidiaries, affiliates, divisions, predecessors, successors, employees, managers, officers, directors, shareholders, partners, general partners, limited partners, members, agents, or any other Person acting, or purporting to act, with or on behalf of any of the foregoing.

"Reflecting" and "Concerning" shall mean regarding, referring to, enumerating, listing, summarizing, describing, embodying, evidencing, mentioning, analyzing, pertaining to, concerning, arising out of, in connection with, constituting, or in any way legally, logically, or factually connected with the matter discussed.

"Thing" refers to any tangible object other than a document and includes objects of every kind and nature, including but not limited to prototypes, models, specimens, computer disks and tapes, videotapes, and audiotapes

"Two Seas Capital LP" shall mean Two Seas Capital LP, a Delaware limited liability company based in New York at 32 Elm Place, 3rd Floor, Rye, NY 10580, and each and all of their current and former parents, owners, subsidiaries, affiliates, divisions, predecessors, successors, employees, managers, officers, directors, shareholders, partners, general partners, limited partners, members, agents, or any other Person acting, or purporting to act, with or on behalf of any of the foregoing, including but not limited to, Sina Toussi, Chief Investment Officer, and Lawrence Palermo, Chief Financial Officer.

"You," and "Your" means 507 Summit LLC, a Delaware limited liability company based in New York, and each and all of their current and former parents, owners, subsidiaries, affiliates, divisions, servants, in-house and outside attorneys, accountants, consultants, predecessors in interest, successors, employees, managers, officers, directors, shareholders, partners, general partners, limited partners, members, agents, or any other Person acting, or purporting to act, with or on behalf of any of the foregoing, including but not limited to Kyle Cleeton.

As used herein, the singular includes the plural and the plural includes the singular; the conjunctive includes the disjunctive and the disjunctive includes the conjunctive; the masculine includes the feminine and the feminine includes the masculine; and the present tense includes the past tense and the past tense includes the present tense so as to bring within the scope of these Document Requests all responses that might otherwise be construed to be outside of their scope.

If you are unable to respond to any part of the requests for production in full, please respond to the extent possible and specify your reasons for not responding completely. If you lack information necessary to respond fully to any request for production, please describe the specific efforts made by you or anyone on your behalf to ascertain the information and state as definitively as possible when you anticipate obtaining the information sought and supplementing your response. If any requested document cannot be produced in full, produce it to the extent possible, specifying your reasons for your inability to produce the remainder and stating whatever information, knowledge, or belief you have Concerning the unproduced portion.

If you object to any request as overly broad or unduly burdensome, you shall produce those documents and/or things that are unobjectionable and specifically identify the respect in which the request is allegedly overly broad or burdensome.

If you are aware that any document or thing responsive to any request once existed but has been destroyed, or is no longer available for production, you shall identify who destroyed it, why it was destroyed, and the circumstances under which it was destroyed or is no longer available.

If any document or thing is not produced based on a claim of privilege, or if you contend a document or thing is otherwise exempt from discovery, please identify the document by

providing the following information: (1) name, position, and title of the author; (2) name, position, and title of the addressee; (3) purpose for preparing the document; (4) date of the document; (5) number of pages, attachments, or appendices; (6) brief description or summary of the document's content; (7) all persons to whom the document was distributed, shown, or explained; (8) present custodian; and (9) the nature of the privilege or objection asserted.

Respond to each of the requests separately. Identify to which specific request every document is responsive. If the same document is responsive to more than one request, identify all requests to which it is responsive.

Produce all documents as they are kept in the usual course of business so that Defendants can ascertain the files in which the documents are located, their relative order in such files, and how such files are maintained.

**Requests**

1. All Documents and Communications Concerning or reflecting Your purchase, sale (including short sale), ownership, retention, acquisition, transfer, or disposition of any securities or financial instruments Reflecting Your Ownership Interests in Fang and/or CIH, including but not limited to, forwards, options, futures, swaps, warrants, swaptions, and any other financial derivatives that reference your Ownership Interests in Fang and/or CIH, if any, the date of each transaction, the number and type of securities or derivatives involved in each transaction, and the price paid or received in each transaction during the time periods:

   1) June 21, 2018 through and including July 31, 2019;
   2) August 1, 2019 through and including October 31, 2019;
   3) November 1, 2019 through and including January 31, 2020;
   4) February 1, 2020 through and including September 30, 2021;
   5) October 1, 2021 through and including January 31, 2022;
   6) February 1, 2022 through and including April 30, 2022;
   7) May 1, 2022 through and including May 29, 2023; and
   8) May 30, 2023 through and including April 25, 2025.

2. All Documents and Communications between You, on the one hand, and any directors, officers, employees, or agents of Plaintiff, Oasis Capital Advisors, LLC, Oasis Management (Hong Kong), and/or Oasis Capital Partners (Texas) Inc., on the other, Concerning the allocation of and/or payment of any potential settlement proceeds or judgment proceeds resulting from this Action.

3. All Documents and Communications between You, on the one hand, and any directors, officers, employees, or agents of Lorelie NCC Inc. or Two Seas Capital Partners LP on the other, Concerning the allocation of and/or payment of any potential settlement proceeds or judgment proceeds resulting from this Action.

4. All Documents and Communications between You, on the one hand, and any directors, officers, employees, or agents of Lepercq Group on the other, Concerning the allocation

of and/or payment of any potential settlement proceeds or judgment proceeds resulting from this Action.

5. All Documents and Communications between You, on the one hand, and any directors, officers, employees, or agents of Koa Capital LP on the other, Concerning the allocation of and/or payment of any potential settlement proceeds or judgment proceeds resulting from this Action.

6. All Documents and Communications between You, on the one hand, and any directors, officers, partners, employees, or agents of Reid Collin & Tsai LLP on the other, Concerning the allocation of and/or payment of any potential settlement proceeds or judgment proceeds resulting from this Action.

7. All Documents and Communications between You, on the one hand, and any directors, officers, employees, or agents of Plaintiff, Oasis Capital Advisors, LLC, Oasis Management (Hong Kong), and/or Oasis Capital Partners (Texas) Inc. on the other, Concerning any of the allegations in the Amended Complaint and/or Your understanding and views of the at-issue transactions in this Action.

8. All Documents and Communications between You, on the one hand, and any directors, officers, employees, or agents of Lorelie NCC Inc. or Two Seas Capital Partners LP on the other, Concerning any of the allegations in the Amended Complaint and/or Your understanding and views of the at-issue transactions in this Action.

9. All Documents and Communications between You, on the one hand, and any directors, officers, employees, or agents of Lepercq Group on the other, Concerning any of the allegations in the Amended Complaint and/or Your understanding and views of the at-issue transactions in this Action.

10. All Documents and Communications between You, on the one hand, and any directors, officers, employees, or agents of Koa Capital LP on the other, Concerning any of the allegations in the Amended Complaint and/or Your understanding and views of the at-issue transactions in this Action.

11. All Documents and Communications between You, on the one hand, and any directors, officers, employees, or agents of Evenstar on the other, Concerning any of the allegations in the Amended Complaint and/or Your understanding and views of the at-issue transactions in this Action.

12. All Documents and Communications between You, on the one hand, and any directors, officers, partners, employees, or agents of Reid Collin & Tsai LLP on the other, Concerning any of the allegations in the Amended Complaint and/or Your understanding and views of the at-issue transactions in this Action.

13. All Documents and Communications between You, on the one hand, and any directors, officers, employees, or agents of Plaintiff, Oasis Capital Advisors, LLC, Oasis Management (Hong Kong), and/or Oasis Capital Partners (Texas) Inc. on the other, Concerning the Winding-Up Petition brought by Petitioners Koa Capital LP and You

against Respondents Tianquan Mo and Fang Holdings Ltd. in the Grand Court of the Cayman Islands on January 19, 2024.

14. All Documents and Communications between You, on the one hand, and any directors, officers, employees, or agents of Lorelie NCC Inc. or Two Seas Capital Partners LP on the other, Concerning the Winding-Up Petition brought by Petitioners Koa Capital LP and You against Respondents Tianquan Mo and Fang Holdings Ltd. in the Grand Court of the Cayman Islands on January 19, 2024.

15. All Documents and Communications between You, on the one hand, and any directors, officers, employees, or agents of Lepercq Group on the other, Concerning the Winding-Up Petition brought by Petitioners Koa Capital LP and You against Respondents Tianquan Mo and Fang Holdings Ltd. in the Grand Court of the Cayman Islands on January 19, 2024.

16. All Documents and Communications between You, on the one hand, and any directors, officers, employees, or agents of Koa Capital LP on the other, Concerning the Winding-Up Petition brought by Petitioners Koa Capital LP and You against Respondents Tianquan Mo and Fang Holdings Ltd. in the Grand Court of the Cayman Islands on January 19, 2024.

17. All Documents and Communications between You, on the one hand, and any directors, officers, employees, or agents of Evenstar on the other, Concerning the Winding-Up Petition brought by Petitioners Koa Capital LP and You against Respondents Tianquan Mo and Fang Holdings Ltd. in the Grand Court of the Cayman Islands on January 19, 2024.

18. All Documents and Communications between You, on the one hand, and any directors, officers, partners, employees, or agents of Reid Collin & Tsai LLP on the other, Concerning the Winding-Up Petition brought by Petitioners Koa Capital LP and You against Respondents Tianquan Mo and Fang Holdings Ltd. in the Grand Court of the Cayman Islands on January 19, 2024.

# Exhibit 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF   NEW YORK

OASIS INVESTMENTS II MASTER FUND LTD., and
LORELEI NCC INC., derivatively on behalf of nominal
defendant FANG HOLDINGS LIMITED,

Index No.

**Plaintiff(s),**

***Summons***

*-against-*

VINCENT TIANQUAN MO, RICHARD JIANGONG DAI,
ACE SMART INVESTMENTS LIMITED, NEXT DECADE
INVESTMENTS LIMITED, MEDIA PARTNER
TECHNOLOGY LIMITED, and TRUE KNIGHT LIMITED,

Date Index No. Purchased:

**Defendant(s).**

**To the above named Defendant(s)**

VINCENT TIANQUAN MO, RICHARD JIANGONG DAI, ACE SMART INVESTMENTS LIMITED, NEXT DECADE
INVESTMENTS LIMITED, MEDIA PARTNER TECHNOLOGY  LIMITED, and TRUE KNIGHT LIMITED

You are hereby summoned to answer the complaint in this action and to serve
a copy of your answer, or, if the complaint is not served with this summons, to serve
a notice of appearance, on the Plaintiff's attorney within 20 days after the service of
this summons, exclusive of the day of service (or within 30 days after the service is
complete if this summons is not personally delivered to you within the State of New
York); and in case of your failure to appear or answer, judgment will be taken against
you by default for the relief demanded in the complaint.

The basis of venue is   CPLR 503 and 509
which is   where a substantial portion of the events or omissions giving rise to Plaintiffs' claims occurred.

Dated:  Austin, Texas

May 29, 2023

Reid Collins & Tsai LLP

by _____

William T. Reid, IV

**Attorneys for Plaintiff**
420 Lexington Avenue, Suite 2731
New York, NY  10170
Tel:  212-344-5200
Fax:  212-344-5299

Case 1:25-mc-00235-KHP    Document 17-1    Filed 08/08/25    Page 11 of 88

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------X

OASIS INVESTMENTS II MASTER FUND LTD. and
LORELEI NCC INC., derivatively on behalf of nominal
defendant FANG HOLDINGS LIMITED,

Index No.:

**SHAREHOLDER
DERIVATIVE COMPLAINT**

Plaintiffs,

    -against-

VINCENT TIANQUAN MO, RICHARD JIANGONG
DAI, ACE SMART INVESTMENTS LIMITED, NEXT
DECADE INVESTMENTS LIMITED, MEDIA
PARTNER TECHNOLOGY LIMITED, and TRUE
KNIGHT LIMITED,

Defendants.

-------------------------------------------------------------------X

**REID COLLINS & TSAI LLP**
William T. Reid, IV
Yonah Jaffe
Aaron A. Brown
420 Lexington Avenue, Suite 2731
New York, New York 10170
T: 212-344-5200
F: 212-344-5299
wreid@reidcollins.com
yjaffe@reidcollins.com
abrown@reidcollins.com

Nathaniel J. Palmer (*pro hac vice to be filed*)
Michael Yoder (*pro hac vice to be filed*)
1301 S. Capital of Texas Hwy, C-300
Austin, Texas 78746
T: 512-647-6100
F: 512-647-6129
npalmer@reidcollins.com
myoder@reidcollins.com

*Counsel for Plaintiffs Oasis Investments II
Master Fund Ltd. and Lorelei NCC Inc.*

# TABLE OF CONTENTS

NATURE OF ACTION ................................................................................................. 1

PARTIES ..................................................................................................................... 7

A.  Plaintiffs ....................................................................................................... 7

B.  Defendants ..................................................................................................... 8

C.  Nominal Defendant Fang Holdings ............................................................. 10

RELEVANT NON-PARTIES ...................................................................................... 11

JURISDICTION AND VENUE .................................................................................... 12

FACTUAL BACKGROUND ........................................................................................ 20

A.  Defendant Mo Caused Fang to Spin-Off CIH in New York and then Buy Back
     the CIH Shares His Affiliates Received to Benefit Himself at Fang's Expense. ........... 20

     1.  Defendant Mo Caused Fang to Spin-Off CIH to Advantage Himself and
          Facilitate Self-Dealing. ........................................................................ 20

     2.  Defendant Mo Caused Fang to Purchase His Affiliates' CIH Shares at Above-
          Market Prices and to Facilitate that Self-Dealing through Buybacks. ................. 23

B.  Defendant Mo's Egregious Self-Dealing Triggered a Chain Reaction that Defendant
     Mo and Defendant Dai Utilized as Cover to Further Enrich Themselves. ...................... 31

     1.  Defendant Mo's History of Self-Dealing Gave Rise to a Winding-up petition
          Filed in the Cayman Islands and Acceleration of Debt Owed by Fang. ............... 31

     2.  Defendant Mo and Defendant Dai Used the Winding-up petition—that
          Defendant Mo Caused—as an Excuse to Not File Fang's Securities Filings. ....... 34

     3.  Defendant Mo and Defendant Dai Used Fang's NYSE Delisting to Acquire
          Massive Positions in Fang and CIH at Steep Discounts. ..................................... 41

C.  Defendant Mo and Defendant Dai Cause Fang to Buy Out Minority Holders in CIH,
     Enabling Them to Take CIH Private Without Paying a Dime Themselves. .................... 48

D.  Defendants Have Been Unjustly Enriched Through Defendant Mo's and Defendant
     Dai's Interrelated Breaches of Fiduciary Duty to Fang and Systemic Abuses of New
     York's Capital Markets. ........................................................................................ 54

PLAINTIFFS' DERIVATIVE STANDING ................................................................. 60

CAUSES OF ACTION ............................................................................................ 61

Count I: Breach of Fiduciary Duty (Against Defendants Mo and Dai) ......................... 61

Count II: Dishonest Assistance (Against Defendants Mo, ACE, and True Knight) .................... 67

Count III: Alter Ego (Against Defendants Mo and ACE) ........................................... 69

Count IV: Alter Ego (Against Defendants Dai and True Knight) ................................. 70

Count V: Dishonest Assistance (Against Defendants Media Partner and Next Decade) ............ 71

Count VI: Knowing Receipt (Against Defendants Media Partner and Next Decade) ................. 72

NOTICE OF INTENT TO RAISE ISSUES UNDER FOREIGN LAW ...................................... 73

PRAYER FOR RELIEF ........................................................................................ 73

## NATURE OF ACTION

1.      This shareholder derivative action is brought on behalf of nominal defendant Fang
Holdings Limited ("Fang") to seek redress against two of its directors, Defendants Vincent
Tianquan Mo ("Mo") and Richard Jiangong Dai ("Dai"), for breaching the fiduciary duties they
owed to Fang, and against their affiliated entities that they utilized in connection with those
breaches. Defendants Mo and Dai serially breached their fiduciary duties by exploiting New
York's capital markets to enrich themselves through self-dealing and by acting in bad faith against
Fang's bests interests.

2.      Fang, formerly known as SouFun Holdings Limited, went public on September 17,
2010, when its American Depositary Shares ("Fang ADSs") were listed on the New York Stock
Exchange ("NYSE"). Defendant Mo, Fang's founder and controlling stocker and then CEO and
Chairman, traveled to New York to ring the opening bell on the day of Fang's IPO. Fang ADSs
priced at $42.50 in the IPO and skyrocketed over 72.9% to close at $73.50 that day.

3.      While Fang's IPO was superficially a success, Defendant Mo primarily used it as a
tool to serve his own self-interest rather than Fang's interests. Indeed, Fang itself received only
$10.5 million in IPO proceeds, just 8.4% of the total raised, and incurred over $3 million in related
expenses for professional fees. Defendant Mo, meanwhile, utilized Fang's IPO and a related
private placement transaction to remove a large Fang shareholder, thereby eliminating a potential
check on Defendant Mo's ability to operate Fang as he saw fit. And in the process, Defendant Mo,
through an affiliate, increased his Fang holdings and obtained an instant unrealized gain of almost
$6.9 million plus stock options for nearly two million additional Fang shares. Thus, from the
inception of Fang's listing on the NYSE, Defendant Mo utilized Fang's access to New York's
capital markets as a vehicle to further his own selfish interests.

4.      Following Fang's IPO, the market price for Fang ADSs peaked in January 2014 and then gradually declined in the years thereafter. Defendant Mo's pervasive self-dealing through related party transactions, many involving properties located in New York and debt instruments incorporating New York law, was a contributing factor for the decline. Due to those transactions and other factors, Defendant Mo, once a paper billionaire based on the market price of his Fang holdings, suffered a substantial decline in his net worth.

5.      By 2019, Defendant Mo sought to monetize some of his substantial Fang holdings to salvage what he could, as much of his remaining—albeit deflated—net worth was still tied up in Fang.[1] But Defendant Mo faced a dilemma because selling large blocks of his Fang securities to a third party was undesirable for several reasons:

- First, as Fang's chairman, founder, and controlling stockholder, Defendant Mo was an "affiliate" of Fang under U.S. securities laws, meaning that his Fang securities were deemed restricted securities. As a result, Defendant Mo's Fang holdings were illiquid absent a registered offering (which was itself undesirable for Defendant Mo due to disclosure requirements and possible securities fraud litigation risks);

- Second, large sales of Fang securities by Defendant Mo were likely to trigger a significant negative reaction in the marketplace, thereby reducing the value of his remaining Fang holdings; and

- Third, selling his Fang shares would reduce his control over and potential future upside in the business.

6.      Defendant Mo's self-serving "solution" to his predicament was to orchestrate an integrated, two-part scheme through which: (1) Fang would spin-off its highly profitable, wholly owned subsidiary, China Index Holdings Limited ("CIH") as a new publicly traded company in New York; and (2) then Defendant Mo would exploit his complete control over Fang to cause

---

[1] Defendant Mo resigned as Fang's CEO on January 21, 2019. He remained in his role as Fang's chairman of the board of directors until February 28, 2022, however, and has at all relevant times been Fang's controlling stockholder and ultimate human controller.

Fang to buy back —at inflated prices—the CIH interests that Defendant Mo received through the spin-off of CIH from Fang.

7.      This self-enrichment scheme eliminated each of the downsides—described above—that Defendant Mo would have faced in trying to sell his Fang interests to third parties:

- First, while the CIH interests that Defendant Mo would obtain through the CIH spin-off would also be restricted securities, he had a pre-arranged buyer under his control in Fang. By splitting his holdings in two and causing Fang to buy back his restricted CIH securities, Mo could obtain liquidity outside of a registered offering (and while avoiding the steep discount normally associated with sales of restricted securities);

- Second, Defendant Mo could avoid the appearance of insider selling that could trigger a large Fang ADS price drop;[2] and

- Third, Defendant Mo would not need to give up control over Fang or the operating business spun off through CIH because his complete control of Fang enabled him to control how Fang would vote its newly acquired CIH shares.

As an added bonus, this scheme enabled Defendant Mo to retain significant indirect economic upside in the CIH shares he sold back to Fang by virtue of his substantial stake in Fang.

8.      To carry out this self-interested scheme, Defendant Mo utilized New York's capital markets. Defendant Mo initiated the first step of this scheme in June 2019 by causing Fang to spin-off CIH as a new publicly traded company with its own ADSs listed on the NASDAQ exchange in New York. As part of this transaction, each Fang shareholder—including Defendant Mo and his affiliates—received new CIH shares or CIH ADSs on a pro rata basis in accordance with their prior ownership interest in Fang.

---

[2] While Fang's ADS price would be expected to drop through the spin-off, the combined price of Fang ADSs and CIH ADSs would have been expected to equal or exceed the Fang ADS price prior to the transaction. A typical rationale behind a spin-off is that the combined value of two companies when separated is greater than the value of the integrated company prior to the spin-off, *i.e.,* the sum of the parts is worth more than the whole.

9.      Defendant Mo then implemented the second step of the scheme by causing Fang to purchase over $81.2 million in CIH securities from his affiliates in December 2019 and June 2020. Those transactions constituted brazen self-dealing because the $5.99 per CIH share price that Fang paid to Defendant Mo's affiliates dwarfed both the prevailing market prices and the average prices of $3.32 and $2.48 that Fang paid for CIH securities on the open market in New York during those periods. At the same time, Defendant Mo caused Fang to purchase CIH ADSs in New York in furtherance of this scheme, as those purchases both helped disguise the extent of his self-dealing and offset some of the overall economic interest he lost in CIH from selling CIH securities to Fang (because Defendant Mo held a large stake in Fang and thus held indirect ownership in CIH through his Fang holdings).

10.     In carrying out his two-part scheme, Defendant Mo breached his fiduciary duties as Fang's chairman. Using Fang as a personal liquidity provider and causing Fang to pay double the prevailing NASDAQ market price for his affiliates' CIH securities only served to benefit Defendant Mo, not Fang. Through this scheme, Defendant Mo and his affiliates received nearly $81.2 million in cash (from Fang) without losing any control over Fang (or CIH) and while avoiding the many pitfalls of selling Fang interests to third parties. Fang, meanwhile, spent over $95.4 million to end up with an 18.5% non-controlling interest in an entity that had been its wholly owned subsidiary just one year before. These interrelated transactions were against Fang's best interests, made no rational business sense, and contradicted the stated reasons for the spin-off as set forth in Fang's and CIH's securities filings.

11.     Ultimately, Defendant Mo's egregious self-dealing and breaches of fiduciary duty in this two-part scheme involving CIH, along with Defendant Mo's prior history of abuse towards Fang in related party transactions involving New York properties and New York debt instruments,

Case 1:25-mc-00235-KHP    Document 17-1    Filed 08/08/25    Page 18 of 88

led certain Fang investors to institute a winding-up petition in the Grand Court of the Cayman Islands in November 2020.

12.     Although it was clear by late 2021 that the winding-up petition no longer posed any ongoing threat to Fang, it nevertheless presented Defendant Mo with a pretextual excuse to further abuse Fang and enrich himself. Specifically, Defendant Mo (and later Defendant Dai, who was Defendant Mo's nephew and replaced Defendant Mo as Fang's chairman of the board on February 28, 2022) used the winding-up petition as an excuse for Fang not to file its required Form 20-F annual reports with the Securities and Exchange Commission ("SEC"). Defendants Mo and Dai caused Fang to cease filing its required SEC filings (*i.e.,* "go dark") so that they could procure large chunks of Fang and CIH shares cheaply for themselves.

13.     As Defendants Mo and Dai were aware from Fang's communications with the NYSE, under NYSE rules, the failure to timely make securities filings necessarily would result in Fang's delisting from the NYSE. NYSE delisting, in turn, would reduce the liquidity and price of Fang securities. Thus, by creating a dark cloud of uncertainty over Fang due to the threat of NYSE delisting (and Fang's failures to report any financial results, more broadly), Defendant Mo and Defendant Dai could artificially devalued Fang by driving down its share price. At the same time, creating substantial doubt over Fang's prospects would artificially depress the price of CIH securities because of: (a) the interrelationships and financial entanglements between the two companies; (b) Defendant Mo's common control over both; and (c) that most large investors in Fang were also large investors in CIH and would be prone to exit both positions.

14.     Ultimately, Defendant Mo and his nephew, Defendant Dai, executed their self-serving "going dark" scheme to perfection. They caused Fang to cease all financial reporting after March 2021, and the NYSE eventually delisted Fang ADSs on June 2, 2022. In the months (and

days) leading up to the delisting, Defendants Mo and Dai exploited the threat of Fang's NYSE delisting and devaluation to buy 24.8% of Fang's equity and 22.6% of CIH's equity for themselves through their affiliated entities.

15.    The large stakes that Defendants Mo and Dai obtained in Fang and/or CIH were the fruits of their fiduciary duty breaches in causing Fang's NYSE delisting to benefit themselves to Fang's detriment and in exploiting material non-public information in the process. By the end of 2021, the winding-up petition was no longer a threat to Fang and all related fall-out had been resolved. But rather than resume filing public financial disclosures, Defendant Mo and Defendant Dai continued to use the winding-up petition as a pretext to assert doubts over whether Fang could continue as a going concern and as an excuse for Fang to continue to not timely file its securities filings in 2022. That Defendant Mo and Defendant Dai—in securities filings they signed—stated that Fang faced a going concern question was particularly galling in that: (a) Fang was highly solvent and financially sound, with over $1.9 billion in assets compared to just $1.2 billion in liabilities; and (b) Defendant Mo and Defendant Dai used Fang to fund a take private transaction of CIH shortly after Fang's NYSE delisting.

16.    Indeed, barely two months after Fang's delisting from the NYSE, Defendant Mo and Defendant Dai compounded their breaches of fiduciary by announcing that Fang would "sponsor" a take private transaction involving CIH. Even though Defendant Mo and Defendant Dai had used purported questions over Fang's ability to continue as a going concern as an excuse for failure to file Fang's securities filings, the take private transaction was structured so that Fang itself would "sponsor" the transaction and provide $14.8 million in equity financing—with cash on hand—to buy-out CIH's few remaining minority investors. Defendant Mo and Defendant Dai, meanwhile, would keep their economic interests in CIH's business without paying one cent. That

Defendant Mo and Defendant Dai exploited Fang to "sponsor" and fully fund a CIH take private transaction shortly after they gobbled up huge stakes of Fang and CIH further establishes that (1) Defendant Mo and Defendant Dai knew that there was no genuine question over Fang's ability to continue as a going concern in 2022; (2) that the pretextual reason given for Fang's NYSE delisting was an utter sham; (3) and that Defendant Mo and Defendant Dai acted against Fang's best interests to benefit themselves by exploiting market uncertainty that they themselves had created through prior misconduct. This take private transaction, which required performance in New York and utilized New York law, closed on April 17, 2023.

17.     Plaintiffs, registered shareholders of Fang, now seek to bring this derivative action on Fang's behalf to redress Defendant Mo's and Defendant Dai's compound breaches of fiduciary duty to Fang and related abuses of New York's capital markets to enrich themselves. Defendant Mo and Defendant Dai should be forced to account for and disgorge all profits received in connection with the 24.8% stake in Fang and 22.6% collective stake in CIH they procured by their bad faith actions in causing Fang to "go dark" and suffer NYSE delisting. Defendant Mo and his affiliates should likewise be held accountable for the $81.2 million they received from Fang to obtain CIH shares at above-market prices. And Defendant Mo should be forced to compensate Fang for the harm it suffered as a result of his serial fiduciary breaches, including spending over $130 million to end up with a 35.8% minority interest in CIH's business, which Fang had owned entirely before Defendant Mo set off a chain reaction of fiduciary duty breaches.

## PARTIES

### A.    Plaintiffs

18.     Plaintiff Oasis Investments II Master Fund Limited ("Oasis") is an exempted company incorporated under the laws of the Cayman Islands. Oasis carries out its investment management activities through two primary investment advisors, one based in Hong Kong and one

based in Austin, Texas. Oasis is a registered holder in Fang and has held shares or beneficial interest in such shares through Fang ADSs at the time of the transactions complained of herein and continues to hold its shares through the present.

19. Plaintiff Lorelei NCC Inc. ("Lorelei") is a corporation incorporated under the laws of New York. Lorelei carries out its management activities from New York. Lorelei is a registered shareholder of Fang. Lorelei obtained a beneficial interest in Fang securities prior to the completion of take private transaction involving CIH complained of herein and continues to hold its shares through the present.

## B. Defendants

20. Defendant Vincent Tianquan Mo is Fang's founder and served as chairman of Fang's board of directors from 1999 until February 28, 2022. Defendant Mo, directly and through affiliated entities he owns and/or controls, is Fang's controlling shareholder. He held approximately 71.7% of aggregate voting power during 2019 according to Fang's last Form 20-F filing for the year ended December 31, 2019. Since then, Defendant Mo materially added to his interests, as described below. As of their most recent amended Schedule 13D filed on May 24, 2022, Defendant Mo and his affiliates beneficially own and control 45.5% of Fang Class A shares and 95.9% of Fang Class B shares, meaning that Defendant Mo now effectively controls over 85.15% of the aggregative voting power of Fang shareholders and holds a 59.09% economic interest in Fang. Defendant Mo also served as a CIH director and chairman of CIH's board of directors from the time that CIH was spun-off in June 2019 until February 28, 2022, and was CIH's

controlling shareholder during the relevant period. Defendant Mo is a citizen of the People's Republic of China ("PRC").

21.     Defendant ACE Smart Investments Limited ("ACE"), a Hong Kong entity, is an affiliate of Defendant Mo and is wholly owned, controlled, and dominated by him. Its principal place of business is Room 1901, 19/F, Lee Garden One, 33 Hysan Avenue, Causeway Bay, Hong Kong SAR. As described below, Mo utilized ACE as a vehicle to obtain significant stakes in Fang and CIH from third-party investors in the months leading up to Fang's delisting from NYSE. According to Defendant Mo's most recent securities filings, ACE owns 22,381,344 Fang Class A shares and owned 11,669,921 CIH Class A shares (of which 9,962,597 were at one time held in the form of CIH ADSs) prior to the completion of the merger transaction in which Defendant Mo, ACE, and others took CIH private.

22.     Defendant Next Decade Investments Limited ("Next Decade"), a British Virgin Islands company, is an affiliate of Defendant Mo under his control. Although Mo's wife has served as its director, recent securities filings state that Next Decade "is controlled by Mr. Mo." Its principal business address is P.O. Box 957, Offshore Incorporations Centre, Road Town, Tortola, British Virgin Islands. As described below, Next Decade was one of Defendant Mo's two holding vehicles (along with Defendant Media Partner Technology Limited) for a large portion of his Fang and CIH interests, and Mo caused it to sell CIH shares to Fang in December 2019 and June 2020. According to its recent securities filings, Next Decade owns 2,505,502 Fang Class A shares and 11,985,145 Fang Class B shares.

23.     Defendant Media Partner Technology Limited ("Media Partner"), a British Virgin Islands company, is an affiliate of Defendant Mo under his control. Although Mo's wife has served as its director, recent securities filings state that Media Partner "is controlled by Mr. Mo." Its

Case 1:25-mc-00235-KHP    Document 17-1    Filed 08/08/25    Page 23 of 88

principal business address is P.O. Box 957, Offshore Incorporations Centre, Road Town, Tortola, British Virgin Islands. Media Partner was one of Defendant Mo's two holding vehicles (along with Next Decade) for a large portion of his Fang and CIH interests, and Mo caused it to sell CIH shares to Fang in December 2019 and June 2020. According to its recent securities filings, Media Partner owns 1,367,378 Fang Class A shares and 11,355,645 Fang Class B shares.

24.    Defendant Richard Jiangong Dai served as a Fang officer (including stints as president and chief executive officer) from 1999 to 2014, and as a Fang director from the time of its IPO in September 2010 until February 2016. On February 28, 2022, Defendant Dai replaced Defendant Mo as a Fang director and Fang's chairman of the board. On that same date, Defendant Dai replaced Defendant Mo as a CIH director and chairman of CIH's board. Defendant Dai is a nephew of Defendant Mo. Defendant Dai is a citizen of the PRC.

25.    Defendant True Knight Limited ("True Knight"), a British Virgin Islands entity, is an affiliate of Defendant Dai and is wholly owned, controlled, and dominated by Defendant Dai. Its principal place of business is Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola, VG1110, British Virgin Islands. As described below, Dai used True Knight to obtain over 8.8 million CIH ADSs and CIH Class A shares on or about April 30, 2022 from Fang/CIH investors shortly before Fang's NYSE delisting.

## C.    Nominal Defendant Fang Holdings

26.    Fang, formerly known as SouFun Holdings Limited, is an exempted company incorporated with limited liability under the laws of the Cayman Islands with registration number 136949. Fang's registered office is at Vistra (Cayman) Limited, P.O. Box 31119, Grand Pavilion, Hibiscus Way, 802 West Bay Road, Grand Cayman, KY1 – 1205 Cayman Islands.

Case 1:25-mc-00235-KHP    Document 17-1    Filed 08/08/25    Page 24 of 88

27.     Fang is principally engaged in the provision of marketing services, listing services, lead generation, financial services, value-added services and e-commerce services to the real estate and home furnishing industries in the PRC. Fang ADSs were listed on the NYSE under the ticker symbol "SFUNY" from the time of its IPO in September 2010 until June 2022, when NYSE delisted Fang ADSs due to Fang's failures to timely file its annual reports and other securities filings.

28.     Fang's ADSs are subject to a deposit agreement with JPMorgan Chase Bank, N.A. in New York. Under the exchange ratio in effect from 2010 to 2014 and then from June 25, 2019, until June 2020, one Fang ADS represents one Fang Class A ordinary share. From June 19, 2020, until present, each Fang ADS has represented ten Fang Class A ordinary shares. Fang Class B ordinary shares have the same economic rights as Class A ordinary shares, but each Class A ordinary share is entitled to one vote per share whereas each Class B ordinary share is entitled to 10 votes per share.

## RELEVANT NON-PARTIES

29.     Prior to the merger described herein, CIH was an exempted company incorporated with limited liability under the laws of the Cayman Islands with registration number 340560.

30.     Ateefa Limited ("Ateefa"), a British Virgin Islands company, is an affiliate of Defendant Mo. Defendant Mo is the sole shareholder of Ateefa. Ateefa owns a 28.0% interest in Safari Group Holdings Limited, through which Ateefa indirectly owns approximately 957,265 Fang Class A ordinary shares.

31.     Deanhale Limited ("Deanhale") is an affiliate of Defendant Mo that owns or owned approximately 1,472,298 Fang Class A shares. Deanhale is wholly owned by Defendant Mo.

32.     Karistone Limited ("Karistone"), a Hong Kong company, is an affiliate of Defendant Mo that owns approximately 926,461 Fang Class A ordinary shares. Karistone is wholly owned by Defendant Mo.

33.     Safari Group Holdings Limited ("Safari") held approximately 3,418,803 Class ordinary shares of Fang as of Fang's most recent for the fiscal year ended December 31, 2019, although Safari subsequently exited its position in January 2022 (in large part as a result of selling shares to ACE, a different affiliate of Defendant Mo). Defendant Mo indirectly holds a 28.0% interest in Safari through Ateefa.

34.     Open Land Holdings Limited ("Open Land"), a British Virgins Islands company, is an affiliate of Defendant Mo that owns or owned approximately 441,650 Fang Class A ordinary shares. Open Land is wholly owned by Defendant Mo.

## JURISDICTION AND VENUE

35.     This court has subject-matter jurisdiction over this action because Plaintiffs seek relief exceeding $150 million, which is in excess of this Court's jurisdictional minimum, in addition to equitable remedies.

36.     Nominal defendant Fang and all Defendants are subject to personal jurisdiction under CPLR 302 because the derivative claims asserted in this suit arise out of the transaction of business in New York by those parties and/or their jurisdictional agents.

37.     Plaintiffs' derivative claims arise out Defendant Mo's and Defendant Dai's breaches of fiduciary duty in several interrelated self-interested transactions involving Fang and CIH that are inseparable from many New York jurisdictional contacts and New York's public markets. Fang had numerous contacts in New York that give rise to the claims asserted in this Action, including spinning-off CIH in New York, buying CIH ADSs on the open market in New York, communicating with the NYSE in New York and getting delisted by the NYSE, and leading

the New York-centered take private of CIH. Because Plaintiffs' claims arise out of those New York-based transactions, nominal defendant Fang is subject to personal jurisdiction in New York.

38. First, Defendant Mo's two-part scheme of causing Fang to spin-off CIH and then buy back CIH shares was implemented through New York. Indeed, Defendant Mo would not have had CIH shares to force Fang to buy from his affiliates but for the New York-centric spin-off of CIH through which Defendant Mo's affiliates obtained CIH interests (that were promptly sold back to Fang). The spin-off was effectuated through a Separation and Distribution Agreement between Fang and CIH dated May 24, 2019, which Defendant Mo signed on Fang's behalf and was governed by New York law. The new CIH ADSs created through the spin-off were subject to a Deposit Agreement with a depositary, JPMorgan Chase Bank, N.A. ("JPMorgan"), located in New York. That Deposit Agreement contains a New York choice of law clause and a New York forum selection clause. And the spin-off resulted in CIH ADSs becoming publicly traded in New York on the NASDAQ exchange.

39. Second, in connection with the part of his scheme involving Fang purchasing CIH shares from his affiliates in 2019 and 2020, Defendant Mo caused Fang to purchase millions of CIH ADSs on the open market in New York. Those open market purchases in New York were part of Defendant Mo's over-arching self-dealing scheme. By increasing Fang's stake in CIH in the lead-up to Defendant Mo's sales of CIH interests to Fang, Defendant Mo partially offset some of his lost economic upside from selling CIH interests to Fang. Moreover, Fang's open market purchases in New York were intended to manipulate the market price higher to lessen the gap between the prevailing market price and the $5.99 per share price that Defendant Mo forced Fang to pay for his affiliates' CIH interests. Accordingly, those purchases in New York were designed to conceal the extent of Defendant Mo's self-dealing and were part of the overall breach of

fiduciary duty in causing Fang to spin-off CIH and then pay $95 million in 2019 and 2020 to buy back an 18.5% non-controlling stake in CIH.

40.     Third, in connection with its delayed securities filings and eventual delisting from NYSE, Fang engaged in "ongoing cooperation and correspondence with the NYSE" (as admitted in Fang securities filings signed by Defendant Mo and Defendant Dai) to extend the cure date for filing as long as possible, eventually to May 17, 2022. The extensions procured via Fang's frequent correspondence with the NYSE afforded Defendant Mo and Defendant Dai additional time to obtain Fang and CIH shares and ADSs from Fang investors seeking to exit their positions before Fang's delisting. As a direct, inevitable, and intended consequence of Fang's failure to file its annual reports and other securities filings by the cure date, Fang's ADSs were delisted by NYSE. Yet at the same time that Defendant Mo and Defendant Dai caused Fang's delisting over the sham excuse that there was a question over whether it could continue as a going concern, they also caused Fang to make open market purchases of CIH ADSs in New York in May and June 2022 to facilitate the take private transaction they orchestrated shortly thereafter. Fang's delisting in New York was integral to Defendant Mo's and Defendant Dai's bad faith, self-interested machinations, and attempt to avoid further accountability by causing Fang to "go dark."

41.     Fourth, the CIH take private transaction orchestrated by Defendant Mo and Defendant Dai was a New York-centered transaction in numerous respects. Almost all of the agreements executed on Fang's behalf to effectuate the transaction included New York choice of law clauses, including: (a) section 10 of the commitment letter that Fang Holdings provided in connection with its commitment to advance $14.8 million to fund the transaction; (b) section 13 of the Limited Guaranty that Fang Holdings provided to CIH in connection with the take private; and (c) section 1.3(l) of the Equity Contribution Agreement signed by all Defendants. And section

Case 1:25-mc-00235-KHP    Document 17-1    Filed 08/08/25    Page 28 of 88

10.8 of the Agreement and Plan of Merger, pursuant to which the take private transaction was consummated, likewise included a New York choice of law clause.

42.      Moreover, section 4 of the Equity Contribution Agreement for the take private transaction required performance by the Defendants and all other participating shareholders (collectively, the "Rollover Shareholders") in New York to the extent that they held any CIH ADSs or held any CIH shares in street name. Specifically, "[t]o the extent that any Rollover Shares of a Rollover Shareholder are held in street name or otherwise represented by ADSs, such Rollover Shareholder shall execute such instruments and take such other actions…to convert his/her/its ADSs into Rollover Shares … pursuant to the terms of the Deposit Agreement, and each Rollover Shareholder shall pay any applicable fees, charges and expenses of the Depositary and government charges due to or incurred by the Depositary in connection with such conversion." Because the Depositary, JPMorgan, was in New York, this provision necessarily required performance in New York by rollover shareholders participating in the take private transaction, including Fang, Defendant Mo's entity ACE, and Defendant Dai's entity True Knight. And ensuring that they and Fang first converted ADSs into shares in New York was integral to the self-serving short-form merger transaction structure that Defendant Mo and Defendant Dai utilized.

43.      Fang was Defendant Mo's jurisdictional agent in each of those New York contacts because Defendant Mo exercised at least some control over Fang in those transactions and Defendant Mo, directly or indirectly through his affiliates, benefitted from those transactions.

44.      Defendant Mo was and is Fang's controlling stockholder and prior to February 28, 2022, was the chairman of its board. At all times, Defendant Mo has dominated and controlled Fang through his power to appoint lackeys as directors (including by installing his nephew, Defendant Dai, as Fang's chairman in February 2022) and to remove any directors who fail to

adhere to his wishes and demands. Fang's securities filings acknowledged that it was "controlled by our significant shareholders and their affiliated entities," and that Defendant Mo and his affiliates had the power to "exert substantial influence over the outcome of any corporate transaction or other matters submitted to the shareholders for approval, including mergers, consolidations, the sale of all or substantially all of our assets, election of directors and other significant corporate actions." Fang's securities filings further acknowledged that absent Defendant Mo's and his affiliates' "consent or cooperation," Fang "could be prevented from entering into transactions or conducting business that could be beneficial to us." Similarly, Fang's securities filings state that Defendant Mo's and his affiliates' Class B shares gave them "concentrated control" and "significant voting power over matters requiring shareholder approval, including election of directors and significant corporate transactions."

45.     In addition to his controlling voting power, Defendant Mo has influenced the composition of Fang's board of directors to ensure that Fang's board is full of compliant puppets. Defendant Mo has done so by wielding power and influence through his roles as Fang's chairman of the board, chairman of Fang's two-member compensation committee (enabling him to dictate director compensation), and role on Fang's two-member nominating and corporate governance committee (giving him direct influence over director selection). Fang has suffered high director turnover due to Defendant Mo's influence.

46.     Finally, the blatant self-dealing alleged herein further demonstrates Defendant Mo's domination and control. Independent directors acting in Fang's best interests rather than at Defendant Mo's direction (and in furtherance of Defendant Mo's interests to curry favor for themselves) would never agree to the lopsided and grossly unfair transactions that Defendant Mo foisted upon Fang.

Case 1:25-mc-00235-KHP    Document 17-1    Filed 08/08/25    Page 30 of 88

47.     Defendant Mo reaped significant benefits from wielding his control over Fang in the transactions at issue. Defendant Mo and his affiliates obtained $81.2 million in cash from Fang through his scheme to spin-off CIH and then sell his CIH interests back to Fang. As a result of Fang's delisting from the NYSE, Defendant Mo (through his wholly-owned, alter ego affiliate, ACE) was able to obtain 11,669,921 CIH Class A shares (of which 9,962,597 were obtained as CIH ADSs) at an artificially deflated price. And by using Fang to "sponsor" the CIH take private, Defendant Mo eliminated CIH's minority investors and took CIH private without needing to pay a dime himself to do so.

48.     Fang was also Media Partner's and Next Decade's jurisdictional agent in connection with Defendant Mo's scheme to cause Fang to spin-off CIH in New York and then purchase CIH units from his affiliates, including Media Partner and Next Decade. Media Partner and Next Decade exercised at least some control over Fang in those transactions because Media Partner and Next Decade were controlling shareholders of Fang and the entities through which Defendant Mo exercised his influence as ultimate human controller and controlling shareholder of Fang. Specifically, Media Partner and Next Decade owned 11,355,645 and 11,985,145 Fang Class B shares, respectively, which (along with their Fang Class A shares) gave them 37.3% and 39.6% voting power in Fang, respectively, as of March 31, 2019 (and they maintained similar voting control thereafter).[3] Fang's securities filings acknowledged that Media Partner and Next Decade had the power to "exert substantial influence over the outcome of any corporate transaction or other matters submitted to the shareholders for approval, including mergers, consolidations, the sale of all or substantially all of our assets, election of directors and other significant corporate actions." Media Partner and Next Decade benefitted from the two-part scheme involving the spin-

---

[3] Media Partner and Next Decade reported the same Fang Class B ownership in the most recent joint Schedule 13D filed jointly with Defendant Mo.

off of CIH and Fang's subsequent purchase of CIH securities because, as part of that scheme, Media Partner and Next Decade sold restricted CIH shares to Fang at a price of $5.99 per share, even though the prevailing New York market price for CIH ADSs was significantly less at the time those sales occurred.

49.    ACE is subject to jurisdiction to New York because it knowingly participated in and was the beneficiary of Defendant Mo's scheme to cause Fang to "go dark" and suffer NYSE delisting so that ACE could obtain Fang ADSs and shares and CIH ADSs and shares at depressed prices. Moreover, ACE is an alter ego of Defendant Mo. ACE also directly participated in and benefitted from the CIH take private transaction.

50.     ACE was also Defendant Mo's jurisdictional agent because Defendant Mo exercised complete domination and control over ACE and benefitted from ACE's participation in the transactions at issue. Defendant Mo controlled ACE in the transactions and signed transactional documents on its behalf, and ACE is wholly owned by Defendant Mo. ACE and in turn, its sole shareholder Defendant Mo benefitted from the transactions because they were able to obtain CIH shares at artificially deflated prices and to participate in a lopsided take private transaction funded by Fang.

51.    Fang was also Defendant Dai's jurisdictional agent from the time that Defendant Dai became Fang's chairman on February 28, 2022 onward. Defendant Dai exercised some control over Fang as its chairman and signed filings with the SEC pertaining to Fang's delisting from the NYSE. In particular, Defendant Dai signed Fang's Form 12b-25 filed May 3, 2022, which set forth the pretextual excuse for Fang's failure to timely file its securities filings. Shortly thereafter, around the time of Fang's delisting, Defendant Dai also caused Fang to purchase CIH ADSs on the open market as part of the scheme he orchestrated with his uncle, Defendant Mo. Defendant

Case 1:25-mc-00235-KHP   Document 17-1   Filed 08/08/25   Page 32 of 88

Dai benefitted from his role in Fang's delisting, as just days before (April 30, 2022) he obtained—through his wholly-owned and controlled entity, True Knight—over 8.8 million CIH Class A shares/ADSs at discount prices from Fang investors.

52.    Defendant Dai also exercised some control over Fang as its chairman in connection with the CIH take private, and Defendant Dai benefitted from the take private through his wholly owned affiliate True Knight. Defendant Dai signed each of the key documents for the take private on Fang's behalf, such as the Equity Commitment Letter provided by Fang, the Equity Contribution Agreement, and the Limited Guarantee provided by Fang.

53.    True Knight is subject to jurisdiction to New York because it knowingly participated in and was the beneficiary of Defendant Dai's and his uncle Mo's scheme to cause Fang to "go dark" and suffer NYSE delisting so that ACE and True Knight could obtain CIH ADSs and shares at depressed prices. Moreover, True Knight is an alter ego of Defendant Dai. True Knight also directly participated in and benefitted from the CIH take private transaction.

54.    True Knight was also Defendant Dai's jurisdictional agent because Defendant Dai exercised complete domination and control over True Knight and benefitted from True Knight's participation in the transactions at issue. Defendant Dai controlled True Knight in the transactions and signed transactional documents on its behalf, and True Knight is wholly-owned by Defendant Dai. True Knight and in turn, its sole shareholder Defendant Dai, benefitted from the transactions because they were able to obtain CIH shares at artificially deflated prices and participate in a lop-sided take private transaction financed by Fang.

55.    In addition to the foregoing jurisdictional contacts in New York, Section 20(c) of the CIH Deposit Agreement includes a forum selection clause providing for exclusive jurisdiction in state or federal New York Courts, as follows:

Case 1:25-mc-00235-KHP    Document 17-1    Filed 08/08/25    Page 33 of 88

By holding an ADS or an interest therein, Holders and Beneficial Owners each irrevocably agree that…any legal suit, action or proceeding…arising out of or based upon…the ADSs…or the transactions contemplated herein, therein or hereby, may only be instituted in a state or federal court in New York, New York, and by holding an ADS or an interest therein each irrevocably waives any objection which it may now or hereafter have to the laying of venue of any such proceeding, and irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding.

56.    Venue is proper under CPLR 503 and 509 because a substantial portion of the events or omissions giving rise to Plaintiffs' claims occurred in New York County.

## **FACTUAL BACKGROUND**

A.    **Defendant Mo Caused Fang to Spin-Off CIH in New York and then Buy Back the CIH Shares His Affiliates Received to Benefit Himself at Fang's Expense.**

*1.    Defendant Mo Caused Fang to Spin-Off CIH to Advantage Himself and Facilitate Self-Dealing.*

57.    During the first half of 2019, Fang began moving forward with a spin-off of its wholly owned and controlled subsidiary, CIH, which prior to the contemplated spin-off previously had operated Fang's real estate information, analytics and marketplace services business. In their securities filings with the SEC, Fang and CIH represented that the spin-off was undertaken for the following reasons, amongst others:

- "Fang's board of directors believe that it is in the *best interests of Fang* and its shareholders *that [CIH] operate* the commercial property-related business *independently*;"

- "The separation and distribution will permit *each company to concentrate its financial resources solely on its own operations*, to provide greater flexibility to invest capital in its business in a timely manner appropriate for its distinct strategy and business needs and to facilitate a more efficient allocation of capital;" and

- "The separation and distribution will facilitate incentive compensation arrangements for employees more directly tied to the performance of the relevant company's business."

Case 1:25-mc-00235-KHP   Document 17-1   Filed 08/08/25   Page 34 of 88

(Emphasis added). After the spin-off, CIH was to focus primarily on the commercial property sector in China, while Fang would retain its real estate internet portal focusing primarily on the residential property sector.

58.     On June 11, 2019, Fang completed the spin-off of CIH. Through the spin-off, CIH became a new public company with CIH ADSs, each representing one CIH Class A share, traded in New York on the NASDAQ exchange. Fang shareholders received one share of CIH common stock for every one share of Fang common stock held as of the record date for the distribution. Fang also disposed of $19.9 million of cash in connection with the spin-off.

59.     Because Defendant Mo was a large Fang shareholder (and Fang's controlling stockholder), he and his affiliates received large numbers of CIH shares through the spin-off. Specifically, Defendant Mo and his affiliates received 7,359,473 CIH Class A shares (convertible into ADSs) and 25,391,206 CIH Class B shares in connection with the spinoff, giving them a 34.1% economic stake in CIH and over 80.6% of voting power in CIH.

60.     As a result, following Fang's spin-off of CIH, Defendant Mo became the controlling stockholder of both Fang and CIH with the same proportionate interest in each. This was highly advantageous for Defendant Mo because Defendant Mo then controlled two entities instead of one, and Mo could exploit his complete control over Fang to cause Fang to "buy back" his newly acquired CIH interests at a self-determined price. Causing Fang to "buy back" the CIH shares that Mo's affiliates acquired through the spin-off instead of selling off his interests in Fang prior to the spin-off was a far more advantageous way for Mo to monetize his Fang interest for several reasons.

61.     First, causing Fang to spin-off CIH shares to his affiliates and then causing Fang to buy them back would enable Defendant Mo to monetize a portion of his ownership interest in the

Case 1:25-mc-00235-KHP    Document 17-1    Filed 08/08/25    Page 35 of 88

overall business while avoiding obstacles he would have in selling his Fang shares to a third party under federal securities laws. Specifically, because Defendant Mo was Fang's founder, chairman, and controlling stockholder, he was an "affiliate" of Fang within the meaning of federal securities laws. His Fang holdings were thus "restricted securities," limiting Defendant Mo's sale options. For instance, Defendant Mo could not avail himself of the Rule 144 safe harbor for any sizeable sales because the trading volume of Fang ADSs was too thin. A registered offering would have been an unattractive option for Defendant Mo because it would have forced him to make market disclosures, been accompanied by potential securities fraud litigation risk, and could trigger a market sell-off (reducing the value of his remaining Fang holdings). And in a third-party sale, he would have been forced to take a large haircut and discount for the lack of liquidity associated with restricted shares compared to freely tradeable Fang ADSs. Using Fang itself as a path to liquidity side-stepped these obstacles.

62.    Second, by causing Fang to spin-off CIH and then buy back the CIH shares his affiliate obtained in the spin-off, Mo would minimize the risk of a negative market reaction and sell-off of Fang shares because he would not be selling any Fang shares. In contrast, any large public sale of his Fang shares would risk triggering a market sell-off in Fang ADSs, especially given Defendant Mo's large stake and historical role at Fang as its founder, controlling stockholder, and face of the company.

63.    Third, causing Fang to spin-off CIH and then buy back the CIH shares his affiliates obtained in the spin-off would enable Defendant Mo to obtain liquidity without losing any control of Fang. Because Defendant Mo would remain as Fang's controlling stockholder and ultimate human controller, he could dictate how Fang would vote for any CIH shares it obtained from his affiliates, meaning that Defendant Mo would lose no control over either Fang's or CIH's

businesses. In contrast, Defendant Mo necessarily would have lost some degree of control over Fang in selling Fang shares to a third party.

64.     Fourth, causing Fang to spin-off CIH and then buy-back CIH shares from his affiliates meant that Defendant Mo would not totally lose all upside associated with the shares he sold. If Defendant Mo sold Fang shares (or CIH shares) to a third party, he would necessarily lose 100% of the economic interest in the shares sold. By instead causing Fang to buy CIH shares, however, Defendant Mo would still retain—indirectly through Fang as a result of his substantial ownership of Fang—some portion of the economic upside associated with the CIH interests sold.

65.     In effect, therefore, causing Fang to spin-off CIH positioned Defendant Mo to monetize a portion of his pre-existing interest in the overall business while avoiding many significant drawbacks that he would have faced in obtaining liquidity if he sold his Fang shares directly. This was no coincidence, but rather part of the reason for the CIH spin-off in the first place. Indeed, the CIH spin-off was merely the first step in a two-part interrelated series of transactions designed to benefit Defendant Mo and his affiliates at Fang's expense. The second step was causing Fang to buy back CIH interests. And as described below, Defendant Mo exploited this opportunity and his conflict of interest as chairman and controlling stockholder of both CIH and Fang to obtain a windfall of tens of millions of dollars in the year after Fang spun-off CIH.

### 2.     *Defendant Mo Caused Fang to Purchase His Affiliates' CIH Shares at Above-Market Prices and to Facilitate that Self-Dealing through Buybacks.*

66.     Barely six months after the CIH spin-off was completed, on December 24, 2019, Fang and two of Mo's affiliates, Next Decade and Media Partner, entered into a Sale and Purchase Agreement. That agreement gave Fang the option to buy up to 15 million aggregate CIH Class A shares and CIH Class B shares from those two Defendant Mo affiliates within the next twelve months at a fixed price of $5.99 per share (more than double the closing price on the date of the

agreement of $2.97 per ADS). The agreement limited Fang's ability to obtain a controlling stake in CIH, however, meaning that Fang would remain a minority, non-controlling investor in CIH to the extent it purchased any CIH shares under the agreement.

67.     Notably, because Defendant Mo, Next Decade and Media Partners were "affiliates" of CIH within the meaning of federal securities laws, CIH shares held by them were deemed "restricted securities." Thus, the Sale and Purchase Agreement contained an express acknowledgement by Fang that any shares it acquired would be unregistered, "restricted securities" and a further acknowledgement that, absent registration of those shares, Fang's ability to sell or transfer the CIH shares it obtained would be severely limited.

68.     Because restricted securities may not be sold outside of a registered offering unless narrow exemptions to registration are satisfied, restricted securities are inherently less liquid—and thus less valuable—than equivalent, unrestricted securities that are freely tradeable on open public markets.[4] Thus, each freely tradeable CIH ADS (representing and readily exchangeable into one CIH share) was inherently more valuable than each restricted CIH share held by Defendant Mo's affiliates, notwithstanding that both CIH ADSs and restricted CIH shares represent the same economic interest.

69.     Nevertheless, Defendant Mo caused Fang to exercise its option to purchase restricted CIH shares from his affiliates, Next Decade and Media Partners, at prices that were significantly *higher* than both the prevailing market price of CIH ADSs and the prices that Fang could and did purchase CIH ADSs on the open market in New York.

---

[4] The same was true of Defendant Mo's Fang restricted securities.

70.     On December 27, 2019, Fang exercised part of its option and purchased 5 million CIH shares from Defendant Mo's affiliates, Next Decade and Media Partner, for a total price of $29.95 million.

71.     The $5.99 per CIH share price that Fang paid to Defendant Mo's affiliates was far above the prevailing market price for CIH ADSs in New York at that time, even though Defendant Mo's affiliates' illiquid restricted securities were inherently less valuable than liquid CIH ADSs freely tradeable on the open market. Specifically, $5.99 was far above the NASDAQ-traded CIH ADS closing price of $3.09 on both December 23, 2019 (the day before Fang entered into the Sale and Purchase Agreement) and December 26, 2019 (the day before Fang exercised its option to buy CIH shares at $5.99 per share).

72.     Moreover, the $5.99 price that Fang paid to Defendant Mo's affiliates far exceeded the price that Fang had paid on the open market in New York for CIH ADSs during 2019. For example, in the month leading up to Defendant Mo's self-dealing on December 27, 2019, Fang purchased 353,763 CIH ADSs on the open market in New York on ten different days at an average price of $3.3220. These purchases (and other purchases made during 2019) were manipulative and intended to drive up the price of CIH ADSs to: (a) attempt to justify Fang paying a higher price for Defendant Mo's CIH interests than if the CIH ADS price had bottomed out; (b) conceal the extent of Defendant Mo's windfall; and (c) further benefit Defendant Mo by driving up the book value of his remaining CIH holdings. In addition, Fang increasing its position in CIH prior to Defendant Mo's sales to Fang increased Defendant Mo's indirect interest in CIH that he enjoyed through his ownership of Fang, thereby offsetting some of the upside in CIH that Defendant Mo otherwise would give up by selling CIH interests.

Case 1:25-mc-00235-KHP    Document 17-1    Filed 08/08/25    Page 39 of 88

73.     On June 23, 2020, Fang again exercised its option and purchased an additional 8,549,249 CIH shares from Defendant Mo's affiliates, Next Decade and Media Partner, for a total of $51.21 million.

74.     Once again, the $5.99 per CIH share price that Fang paid to Defendant Mo's affiliates was far above the prevailing market price for CIH ADSs in New York, even though Defendant Mo's affiliates' illiquid restricted securities were inherently less valuable than liquid CIH ADSs freely tradeable on the open market. Specifically, $5.99 was more than the $3.10 closing price of CIH ADSs on June 22, 2020. And $5.99 far exceeded the $2.484 per ADS weighted average price that Fang actually paid in purchasing 1,872,836 CIH ADSs on the open market in New York in the weeks before:

| Date | ADSs Purchased | Class A Share Equiv. | Price | Total Spent |
|---|---|---|---|---|
| 5/29/2020 | 56,300 | 56,300 | $1.2474 | $70,228.62 |
| 6/1/2020 | 10,700 | 10,700 | $1.2841 | $13,739.87 |
| 6/2/2020 | 16,792 | 16,792 | $1.3947 | $23,419.80 |
| 6/3/2020 | 42,176 | 42,176 | $1.5819 | $66,718.21 |
| 6/4/2020 | 121,009 | 121,009 | $1.9886 | $240,638.50 |
| 6/5/2020 | 133,089 | 133,089 | $2.1022 | $279,779.70 |
| 6/8/2020 | 86,673 | 86,673 | $2.2152 | $191,998.03 |
| 6/9/2020 | 56,442 | 56,442 | $2.4242 | $136,826.70 |
| 6/10/2020 | 74,200 | 74,200 | $2.4066 | $178,569.72 |
| 6/11/2020 | 134,581 | 134,581 | $2.3265 | $313,102.70 |
| 6/15/2020 | 75,700 | 75,700 | $2.4019 | $181,823.83 |
| 6/16/2020 | 82,677 | 82,677 | $2.3837 | $197,077.16 |
| 6/17/2020 | 142,619 | 142,619 | $2.5395 | $362,180.95 |
| 6/18/2020 | 207,944 | 207,944 | $2.6300 | $546,892.72 |
| 6/19/2020 | 56,633 | 56,633 | $2.7737 | $157,082.95 |
| 6/22/2020 | 222,277 | 222,277 | $2.9339 | $652,138.49 |
| 6/23/2020 | 353,024 | 353,024 | $2.9455 | $1,039,832.19 |
| **TOTALS** | 1,872,836 | 1,872,836 | | $4,652,050.14 |

Case 1:25-mc-00235-KHP    Document 17-1    Filed 08/08/25    Page 40 of 88

75.    Moreover, before Defendant Mo caused Fang to begin making those CIH ADSs purchases on the open market in New York, the prevailing price for CIH ADSs had been far lower. Specifically, the 10-day, 20-day, and 30-day average CIH ADS closing prices up to May 28, 2020 (the last day before Fang's purchases commenced) were $1.185, $1.194, and $1.201, respectively.

76.    Defendant Mo caused Fang to purchase CIH ADSs on the open market in New York in order to disguise his planned, brazen self-dealing. Fang's purchases created additional demand for CIH ADSs, resulting in an increase in the prevailing market price. As the prevailing market price of CIH ADSs increased, Defendant Mo's planned self-dealing in forcing Fang to buy his affiliates' CIH shares would appear less egregious. For instance, while the $5.99 price paid to Defendant Mo's affiliates still grossly exceeded the $3.10 closing price on June 22, 2020, the gap between the price Defendant Mo extracted from Fang and the prevailing market price on that date was still much smaller than what it would have been had it not been for the manipulative trading activity in June 2020 that drove the CIH ADS market price up from the $1.18-$1.20 range.

77.    Defendant Mo was also motivated to inflate CIH's open market ADS price because of the way that Fang accounted for its purchases of CIH equity interests from his affiliates. Fang's audited financial statements for the year ended December 31, 2019, expressly acknowledged that Fang's purchase from Defendant Mo's affiliates on December 17, 2019, was "not commensurate to other non-employee shareholders," and, in turn, the "excess of consideration transferred" was accounted for as compensation expense for Defendant Mo in an amount of $13.6 million. This was more than a ten-fold increase from Fang's executive compensation expense in the prior year. Using Fang to artificially drive up the price of CIH ADSs through market purchases in New York would reduce the amount of reported excess compensation expense.

78.     Defendant Mo's self-interested motives for causing Fang to purchase CIH ADSs on the open market are further evidenced by the timing of Fang's CIH share purchases. Aside from Fang's daily open market purchases of CIH ADSs from May 29, 2020 through June 23, 2020, Fang did not make even a single purchase of any CIH ADSs at any other point during 2020. It is thus clear that Fang's purchases in the three weeks leading up to its purchase from Defendant Mo's affiliates were not merely coincidental but were made in furtherance of Defendant Mo's self-dealing.

79.     In addition to concealing the extent of Defendant Mo's self-dealing, Fang's purchases of CIH ADSs on the open market during May and June 2020 also helped offset some of the financial upside in CIH that Defendant Mo would give up by selling his CIH interests to Fang (because Fang's open market purchases increased his indirect ownership in CIH through Fang).

80.     In sum, Defendant Mo's actions in causing Fang to spin-off CIH, causing Fang to exercise its option to buy his affiliates' CIH interests, and causing Fang to buy CIH ADSs on the open market in New York (to conceal the magnitude of his self-dealing and to increase his indirect ownership in the CIH shares his affiliates sold) were part of an interrelated self-enrichment scheme. Through this scheme, Defendant Mo avoided many pitfalls he would have encountered had he instead sought to monetize part of his ownership in the combined business by selling Fang shares directly. And the scheme was a resounding success for Defendant Mo in that he and his affiliates extracted $81.2 million from Fang, while still maintaining complete control over CIH's business because Defendant Mo controlled how Fang would vote the CIH shares it purchased.

81.     The condensed timeline for these transactions and the conspicuous lack of sales from Defendant Mo and his affiliates to any third parties further reveals Mo's intentions and the interrelatedness of the different components of his self-enrichment scheme. Fang spun off CIH

and paid $95.4 million to buy back CIH securities (of which $81.2 million was paid to Defendant Mo's affiliates) within one year, including exercising its option to purchase CIH shares from Defendant Mo's affiliates a mere six months after the spin-off. Notably, Defendant Mo and his affiliates *never* sold any CIH interests to anyone other than Fang, demonstrating that Mo used Fang as a buyer of his CIH interests to side-step liquidity challenges posed by federal securities laws and to obtain a higher price for his CIH interests than he could obtain from a third party.

82.    The existence and wrongfulness of Defendant Mo's inter-related self-enrichment scheme is further evident by the lack of any legitimate reason, or rational business purpose, for these transactions from Fang's perspective. Indeed, the transactions were not in Fang's best interests for several reasons.

83.    First, prior to the spin-off, CIH was a wholly owned Fang subsidiary. Yet, the net effect of these transactions and Defendant Mo's scheme was that Fang depleted over $95.4 million of its cash reserves to obtain a less than 18.5% non-controlling interest in CIH (while also disposing of $19.9 million in connection with the spin-off itself). It was against Fang's best interests to expend such substantial sums only to end up in a worse position vis-à-vis CIH than it had occupied just one year before, prior to the spin-off.

84.    Second, Fang and CIH securities filings related to the spin-off expressly provide that Fang's board of directors had determined that it was "in the best interests of Fang" that CIH operate "independently," and that the spin-off would allow Fang "to concentrate its financial resources solely on its own operations." It was contrary to those stated interests for Fang to expend over $95.4 million while remaining entangled with CIH (by holding a minority, non-controlling position worse than before).

85.     Third, Fang and CIH securities filings related to the spin-off further provide that one of Fang's interests was to "facilitate incentive compensation arrangements for employees more directly tied to the performance of the relevant company's business." Transferring $81.2 million to Defendant Mo by purchasing CIH interests from his affiliates—at prices above the prevailing market price—was untethered to Fang's financial performance, and reducing Defendant Mo's CIH stake could reduce his direct incentive to operate CIH as profitably as possible.

86.     Fourth, it was obviously against Fang's interests to pay more than the prevailing market price for CIH ADSs. Fang could and did obtain CIH ADSs at prices far less than the $5.99 per share price it paid to Defendant Mo's affiliates.

87.     Fifth, there was no reason for Fang to exercise its options at an exercise price ($5.99 per share) far above the spot price of CIH securities and long before the options' December 2020 expiration date. Even if there were some risk that CIH shares might increase in price over time, there was no logical or rational business reason to exercise an option at a strike price far above the spot price with many months left until the option expired. Moreover, just two months after exercising the option early and transferring $51.2 million to Defendant Mo's affiliates in June 2020, Fang announced an intended capital raise (through a dilutive share issuance to management), further indicating that the early option exercise, which depleted Fang's cash reserves, made no rational business sense for Fang.

88.     Sixth, obtaining restricted CIH securities from Defendant Mo's affiliates was the worst possible way for Fang to hold its interest in CIH given the significant liquidity constraints that holding restricted securities entails. Fang had far more liquid and attractive means of owning an interest in CIH at its disposal. Specifically, prior to the spin-off, when CIH was still Fang's wholly owned subsidiary, Fang could monetize and benefit from that interest without any

limitations imposed by securities laws. For instance, Fang could have sold the entire business to a third-party, procured cash from a new minority investor in CIH, obtained debt financing secured by CIH's operating business and assets, or simply held the business and up-streamed dividends paid out of profits. After the spin-off, Fang could—and did—obtain CIH ADSs on the open market, which it could freely resell.

89.     Accordingly, Defendant Mo's actions in perpetrating this self-dealing scheme on Fang involved egregious breaches of the fiduciary duties he owed to Fang: (a) to act in good faith for Fang's best interests; and (b) to act loyally, to avoid conflicts of interest, to avoid self-dealing, and to avoid enriching himself at Fang's expense.

**B.     Defendant Mo's Egregious Self-Dealing Triggered a Chain Reaction that Defendant Mo and Defendant Dai Utilized as Cover to Further Enrich Themselves.**

*1.     Defendant Mo's History of Self-Dealing Gave Rise to a Winding-up petition Filed in the Cayman Islands and Acceleration of Debt Owed by Fang.*

90.     Defendant Mo's interrelated scheme in causing Fang to spin-off CIH, to buy back CIH interests from Defendant Mo at above-market prices, and to cause Fang to buy back additional CIH ADSs on the open market (to help disguise his wrongdoing and to help obtain an offsetting indirect interest in CIH through Fang) was not the only self-dealing that Defendant Mo had engaged in at Fang's expense through 2020. Defendant Mo had a long history of prior self-dealing.

91.     For instance, beginning in 2011 and continuing thereafter, Defendant Mo utilized several New York Section 402 not-for-profit corporations he created, including Wall Street Global Training Center, Inc. ("WSGTC") and Research Center on Natural Conservation, Inc. ("RCNC"), to engage in related party transactions with Fang involving New York real estate. The notable New York properties inculcated in such related party transactions include: 72 Wall Street in Manhattan, the Arden House in Harriman, New York, New York Military Academy in Cornwall-on-Hudson, and Briarcliff College in Westchester County.

Case 1:25-mc-00235-KHP    Document 17-1    Filed 08/08/25    Page 45 of 88

92.    As another example, in the fourth quarter of 2019, Defendant Mo caused Fang to redeem multiple portions of convertible notes (governed by New York law) that were beneficially owned by Defendant Mo *at no discount* to par value and more than two years before the maturity date of those notes. Defendant Mo received approximately $83 million dollars from the early redemption, and Fang's Form 20-F annual report for fiscal year 2019 admitted that the purpose of the redemptions were to "redeem the portion[s] held by Mr. Mo." The documents and circumstances surrounding the early redemption make clear the purpose behind *only* "redeeming the portion[s] held by Mr. Mo" at full par value plus interest was so that Defendant Mo could repay personal debt obligations. Moreover, while the early redemptions involving Defendant Mo were made at no discount to their par value of the notes, Fang had contemporaneously been involved in other transactions where other portions of the same convertible notes payable to third-parties had been sold at *20% less than par their value*. Subsequently, Defendant Mo's self-dealing through this note redemption was a contributing factor to the early acceleration of the remaining balance of over $168 million of convertible notes originally due in 2022 ("2022 Notes"), as discussed below.

93.    Finally, in 2019, Defendant Mo had also caused Fang to transfer all equity interests in 42 different subsidiary entities to Shanghai Yuyue Electronic Technology Development Co., Ltd ("Shanghai Yuyue"), an entity controlled by Defendant Mo, for no consideration (other than Shanghai Yuye's assumption of net liabilities at the carrying amount). Thereafter, Fang continued to utilize the services of the entities transferred.

94.    Against that backdrop, Fang's transfer of $51.2 million to Defendant Mo's affiliates to purchase CIH shares in June 2020 was just the most recent—albeit the most egregious—of several self-dealing transactions that Defendant Mo had foisted on Fang up to that time.

Case 1:25-mc-00235-KHP   Document 17-1   Filed 08/08/25   Page 46 of 88

95.     On August 24, 2020, Fang publicly announced that it planned to raise up to $30 million by issuing Fang Class A shares to members of management, presumably including Defendant Mo. Of course, Fang would have had no reason to raise capital had it not exercised its option early and spent $51.2 million to buy back CIH equity interests from Defendant Mo's affiliates on June 23, 2020, just two months before.

96.     Regardless, Fang's announcement of the dilutive management share issuance, yet another related party transaction, was the last straw for some of Fang's disgruntled shareholders. On November 13, 2020, Evenstar Master Fund SPC for and on behalf of Evenstar Master Sub-Fund I Segregated Portfolio and Evenstar Special Situations Limited (collectively, "Evenstar") filed a winding-up petition in the Grand Court of the Cayman Islands to appoint provisional liquidators for Fang. The petition was predicated on Defendant Mo's history of self-dealing described above, including his actions in causing Fang to spin-off CIH and purchase CIH shares from his affiliates in 2019 and 2020.

97.     Evenstar's filing of its winding-up provision constituted an event of default pursuant to the terms of Fang's outstanding 2022 Notes, triggering an acceleration of the maturity date for repayment of principal and outstanding interest to December 13, 2020.

98.     Thus, Defendant Mo's history of abuse of Fang and self-dealing directly created challenges for Fang by leading to the winding-up petition and acceleration of Fang's debt under the 2022 Notes. Both of these issues were merely temporary crises, however.

99.     First, on July 20, 2021, the Grand Court entered an order, by consent of the parties to the winding-up petition, appointing a new Fang director to be nominated by Evenstar. In conjunction with that order, Evenstar's application for appointment of provisional liquidators was effectively adjourned *sine die*. The winding-up petition is no longer being actively pursued, and

Fang has not faced any active risk of having liquidators appointed or of being wound up since the Grand Court entered its order on July 20, 2021.

100.     Second, Fang and CIH—with Defendant Mo signing on behalf of both—entered into various settlement deeds with the holders of the 2022 Notes from June 25, 2021 to September 22, 2021. Pursuant to the settlement deeds, Fang and CIH each agreed to pay half of the amount due by December 31, 2021. CIH repaid the noteholders $42.4 million on September 24, 2021 and $41.8 million on November 10, 2021, and Fang repaid the noteholders $42.4 million on September 28, 2021 $41.8 million on November 15, 2021. Accordingly, by December 31, 2021, the 2022 Notes had been repaid in full and no longer posed any threat to Fang.

101.     Thus, by no later than November 15, 2021 and certainly by the end of 2021, any temporary challenges associated with the winding-up petition and acceleration of the 2022 Notes—problems of Defendant Mo's own creation through his rampant prior self-dealing—had largely been resolved. But Defendant Mo did not let the crisis he caused go to waste. Instead, Defendant Mo utilized it as cover for an audacious new scheme to benefit himself (and later, his nephew, Defendant Dai) by further abusing Fang and acting against its best interests.

### 2.     *Defendant Mo and Defendant Dai Used the Winding-up petition—that Defendant Mo Caused—as an Excuse to Not File Fang's Securities Filings.*

102.     Notwithstanding the winding-up petition and the acceleration of its 2022 Notes, Fang reported its fourth quarter 2020 and fiscal year 2020 unaudited financial results on March 26, 2021 without any delay or difficulty. Thereafter, however, Defendant Mo—and later his loyal nephew, Defendant Dai—caused Fang to fail to file its Form 20-F annual report for fiscal year 2020 and to cease all financial reporting for all future financial periods.

103.     On May 3, 2021, Fang filed a Form 12b-25, signed by Defendant Mo, that indicated that Fang would not timely file its Form 20-F annual report for the year ending December 31,

Case 1:25-mc-00235-KHP    Document 17-1    Filed 08/08/25    Page 48 of 88

2020. This filing stated that the delay was "primarily due to the pending winding-up petition," and the event of default on the 2022 Notes that the winding-up petition triggered. This filing further explained: "[Fang] is in the process of assessing the impact of the winding-up petition on the Company's financial statements, including the Company's ability to continue as a going concern, the outcome of which is dependent upon the outcome of the petition and the negotiation with the convertible note holders."

104.    Fang subsequently failed to file that report by the May 17, 2021 deadline, prompting the NYSE to inform Fang on May 18, 2021 that Fang was not in compliance with NYSE's continued listing requirements under Section 802.01E of the NYSE Listed Company Manual.

105.    On May 24, 2021, Fang publicly announced—in connection with a Form 6-K filing with the SEC signed by Defendant Mo—that Fang had contacted the NYSE on May 20, 2021 in response to the notice that Fang had received from NYSE. This announcement further acknowledged that Fang faced possible discretionary suspension and delisting if Fang did not timely file its annual report with the SEC.

106.    On November 17, 2021, Fang announced that it had received notice from NYSE Regulation indicating that NYSE's Listings Operations Committee had agreed to an additional trading period through April 25, 2022 for Fang to complete and file its fiscal year 2020 Form 20-F and any subsequent delayed filings pursuant to the NYSE's late filer rules outlined in Section 802.01E of the NYSE Listed Company Manual. Fang further announced that it had "been in ongoing cooperation and correspondence with the NYSE on the late filing issue," and acknowledged that the NYSE would "move forward with the initiation of suspension and delisting

Case 1:25-mc-00235-KHP    Document 17-1    Filed 08/08/25    Page 49 of 88

procedures" if Fang did not cure its delayed filings by May 17, 2022. Defendant Mo signed the associated Form 6-K filing with the SEC containing the November 17, 2021 announcement.

107.    On April 25, 2022, Fang announced that it had received notice from NYSE Regulation indicating that NYSE's Listings Operations Committee had agreed to provide Fang with an additional trading period through May 17, 2022. Again, Fang emphasized that it "ha[d] been in ongoing cooperation and correspondence with the NYSE on the late filing issue," and noted that its ADSs would face suspension and delisting from the NYSE if Fang did not complete its late filings by May 17, 2022.

108.    Fang filed this announcement with the SEC as an attachment to a Form 6-K dated April 25, 2022. Defendant Mo signed this Form 6-K purportedly as Fang's "Executive Chairman," notwithstanding that Fang had previously announced on February 28, 2022 that Defendant Mo's nephew, Defendant Dai, would replace Defendant Mo as Fang's chairman effective February 28, 2022. Thus, Defendant Mo continued to be aware of and actively involved in Fang's belated filing of its required annual reports and potential NYSE delisting.

109.    On May 3, 2022, Fang filed a Form 12b-25 notification of late filing, indicating that it would not be timely filing its Form 20-F annual report for the year ended December 31, 2021 either. This filing, for the first time, disclosed that the 2022 Notes had been repaid in full. Once again, however, Fang stated that it needed more time "primarily due to the pending winding-up petition" and resulting questions over "the Company's ability to continue as a going concern." Defendant Dai signed this filing on Fang's behalf as its executive chairman.

110.    Subsequently, after Fang failed to file its Form 20-F for the year ended December 31, 2020 by the May 17, 2022 deadline for curing the delay, the NYSE suspended trading on May 18, 2022. And on June 2, 2022, the NYSE delisted Fang's ADSs.

Case 1:25-mc-00235-KHP    Document 17-1    Filed 08/08/25    Page 50 of 88

111.    It was not in Fang's best interests to have its ADSs delisted from the NYSE as a result of its failure to timely file its annual reports with the SEC, nor for Fang to "go dark" and cease all financial reporting of its financial results. Defendant Mo's and Defendant Dai's actions in causing Fang to fail to file such reports directly violated Fang's code of conduct (incorporated by reference into Fang's registration statement with the SEC) providing that: "each employee, officer and director must take all reasonable steps to ensure that [Fang's securities filings] and other public communications furnish the marketplace with full, fair, accurate, timely and understandable disclosure regarding the financial and business condition" of Fang.

112.    Moreover, there was no legitimate reason for Fang's failures to report its financial results and to timely file its required annual reports with the SEC. While securities filings signed by Defendant Mo or Defendant Dai blamed those failures on the winding-up petition, resulting default on the 2022 Notes, and a related question over whether Fang could continue as a going concern, those excuses made no sense for several reasons.

113.    First, there is no reason why those issues would have precluded Fang from filing its annual reports for the fiscal year ending December 31, 2020 by the *May 17, 2022* deadline. That Fang was still operating in May 2022 would, by itself, negate any need for a retroactive going concern qualification or disclosures for a fiscal period that ended nearly eighteen months earlier. And given that the 2022 Notes were repaid during 2021, Fang could have simply moved the liability associated with the notes from long-term liabilities to short-term liabilities on its balance sheet as of December 31, 2020, with appropriate footnotes to its financial statements to explain the default and subsequent events.

114.    Second, despite the pending winding-up petition (filed November 2020) and the acceleration of the 2022 Notes (in December 2020), Fang announced its fourth quarter and fiscal

year 2020 unaudited financial results on March 26, 2021. Thus, Fang was perfectly capable of releasing earnings reports despite the purported crisis it faced. Yet Fang failed to release *any* earnings reports after that or make any other securities filings disclosing its financial results. That Fang made financial disclosures on March 26, 2021—*before* repayment of the 2022 Notes or any resolution of the winding-up petition—yet failed to make similar financial disclosures *after* those issues were resolved reveals that neither the winding-up petition nor default was the real reason for Fang's failure to stay current on its securities filings.

115.    Third, neither the winding up proceeding nor Fang's default on the 2022 Notes posed any threat to Fang's ability to continue as a going concern after 2021. The component of the winding-up petition that threatened appointment of provisional liquidators and jeopardized Fang's ongoing operations was resolved consensually by the parties via a July 20, 2021 court order adjourning those claims in the Cayman Islands proceedings. And the last of the holders of the 2022 Notes were repaid in full on November 15, 2021, more than *six months* prior to Fang's May 17, 2022 deadline to file its fiscal year 2020 annual report.

116.    Fourth, Fang remained a highly solvent, successful operating business throughout the relevant time period. Indeed, in approving Fang's settlement and payment of one of the holders of the 2022 Notes in the Cayman Islands proceeding, the Cayman Court specifically found that Fang "is indeed solvent" on both a cash flow and balance sheet basis, noting that Fang had total assets of over $1.9 billion compared to total liabilities of $1.2 billion.

117.    Fifth, around the same time as Fang's May 17, 2022 deadline for filing its fiscal year 2020 annual report, Defendant Mo and Defendant Dai caused Fang to purchase 233,140 CIH ADSs on the open market in New York in May and June 2022. Fang would not have purchased more CIH ADSs if there really had been a legitimate question over its ability to continue as a going

concern. (Notably, neither Defendant Mo nor Fang filed an amended Schedule 13D reporting those acquisitions.)

118.    Sixth, Defendant Mo and Defendant Dai utilized Fang as a sponsor in a take private transaction involving CIH just two months after Fang's delisting, as discussed below. An August 23, 2022 letter outlining Fang's original proposal, signed by Defendant Dai on Fang's behalf, stated that the private proposal "would not be subject to any uncertainty or delay with respect to any debt financing" and "will not be subject to a financing condition." Fang filed an amended Schedule 13D filed with the SEC the next day—signed by Defendant Dai—that also indicated that Fang anticipated funding the transaction with "cash on hand." And in the final form of the take private transaction, Fang committed $14.8 million in equity financing and incurred a $2.2 million guaranty obligation, as described below. These actions were fundamentally inconsistent with Defendant Mo's and Defendant Dai's assertions in public filings that there was a question over whether Fang could continue as a going concern. Indeed, Defendant Mo and Defendant Dai would not have used Fang as the "sponsor" for their CIH take private transaction if Fang had still faced any active threat to its business in 2022.

119.    Moreover, the Equity Commitment Letter obligating Fang to provide $14.8 million in equity financing for the take private transaction—signed by Defendant Dai—included the following representations and warranties:

- Fang "it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization" and "has (and will continue to have) the requisite capacity and authority to execute and deliver this Agreement and to fulfill, to perform its obligations hereunder and to consummate the transactions contemplated hereby;"

- Fang "has (and will continue to have) available funds not less than the sum of the Commitment plus the aggregate amount of all other commitments and obligations [Fang] currently has outstanding;" and

- "there is no Legal Proceeding pending against [Fang], or, to the knowledge of it, threatened against it … that restricts or prohibits the performance by it of its obligations under this Agreement."

Those representations and warranties were fundamentally inconsistent with Defendant Dai's assertions in connection with Fang's NYSE delisting that the winding-up petition raised a question over Fang's ability to continue as a going concern. And this further indicates that the proffered excuse for Fang's delayed securities filings and delisting was a sham.

120.    Seventh, even if there had been some legitimate question over Fang's ability to continue as a going concern, that was not an excuse for failing to file its annual reports indefinitely. To the extent that Fang had concerns, it could have simply included appropriate disclosures in its filed Form 20-F annual reports. Fang's auditors could include an appropriate going concern qualification in their audit opinion to be included in that report, if necessary.

121.    Accordingly, the reasons given in Fang securities filings—signed by Defendant Mo and Defendant Dai—for Fang's failure to timely file its annual reports were a pretextual sham. In reality, Defendant Mo and Defendant Dai caused Fang to "go dark" and stop making its securities filings for self-interested reasons and to benefit themselves (at Fang's expense).

122.    Failing to file Fang's annual reports—or even announce quarterly financial results—benefitted Defendant Mo because it helped conceal Defendant Mo's past, present, and possible future self-dealing. For instance, unlike for fiscal year 2019 where Fang's Form 20-F annual report reflected that the "excess consideration" Fang paid for Defendant Mo's CIH interests was recorded as $13.6 million in executive compensation expense for Defendant Mo, Fang made no such disclosure of Defendant Mo's June 2020 self-dealing. Because Fang never filed its annual

report for fiscal year 2020, Fang never reported the tens of millions of dollars of excess consideration paid in Fang's June 2020 purchase from Defendant Mo's affiliates.[5]

123.    In addition to concealing Defendant Mo's self-dealing, Fang's lack of financial disclosures also benefitted Defendant Mo and Defendant Dai because keeping Fang's investors in the dark necessarily reduced demand for—and hence the market price of—Fang ADSs. In turn, by causing Fang to "go dark" and then also causing Fang to miss its filing deadlines so that Fang would be delisted by the NYSE, Defendant Mo and Defendant Dai set themselves up to further benefit themselves by exploiting Fang. Specifically, Fang's lack of financial disclosures and the threat of Fang's NYSE delisting enabled Defendant Mo and Defendant Dai to facilitate sales of investors' Fang ADSs and shares and CIH ADSs and shares to Defendant Mo and Defendant Dai at a steep discount, as discussed below.

### 3.    Defendant Mo and Defendant Dai Used Fang's NYSE Delisting to Acquire Massive Positions in Fang and CIH at Steep Discounts.

124.    Defendant Mo's actions in causing Fang to "go dark" created an opportunity for self-enrichment through obtaining additional Fang holdings at a steep discount. Fang's continuous failures to disclose any financial results after March 26, 2021, to make its required securities filings, and its NYSE delisting predictably led to a precipitous drop in the price of Fang ADSs during that time period. On March 31, 2021, Fang's ADS closed at $12.50 per ADS. The price of Fang ADSs dropped throughout 2021 as Fang began to "go dark," and closed at $3.81 on December 31, 2021. The price fell further to close at $3.02 on May 16, 2022, the day before Fang's

---

[5] Fang's announcement of second quarter 2020 earnings results on August 14, 2020 did not disclose Fang's June 2020 purchases from Defendant Mo's affiliates. Fang reported a 177.2% increase in general and administrative expenses from $14.9 million in the second quarter of 2019 to $41.3 million for the second quarter of 2020, but misleadingly attributed the increase to "staff related costs" with no reference to Defendant Mo or Fang's purchases of CIH shares from his affiliates.

Case 1:25-mc-00235-KHP    Document 17-1    Filed 08/08/25    Page 55 of 88

cure deadline with the NYSE. And Fang's ADS price fell to $1.90 on June 2, 2022, the day of Fang's NYSE delisting. Since then, mired on the OTC pink sheet, Fang ADSs have traded irregularly and sporadically for mostly far less.

125.    By the same token, Defendant Mo could also obtain CIH shares at a significant discount to fair value or intrinsic value because of the substantial overlap between Fang shareholders and CIH shareholders. Due to Fang's spin-off of CIH in June 2019 (through which Fang shareholders received pro rata distributions of CIH shares or CIH ADSs), most of Fang's large, long-term investors in 2021 and 2022 were also CIH investors. This dynamic played into Defendant Mo's and Defendant Dai's hands because many investors exiting their Fang positions prior to Fang's delisting from the NYSE would seek to exit their CIH positions too (due to the interrelationship between Fang and CIH and Defendant Mo's control over both), either separately or as part of a package deal while unloading their Fang holdings.

126.    In the time period between when Fang first indicated that it would not be timely filing its annual report and its ultimate delisting, Defendant Mo used his wholly-owned alter ego affiliate, ACE, to buy out eleven investors' interests in Fang ADSs or Fang Class A shares, as follows:[6]

---

[6] The dates reflected in this table are the dates on which ACE entered into purchase agreements for Fang securities. Notably, the purchases in May 2022 all closed on May 20, 2022 or May 24, 2022, during the window between when the NYSE suspended Fang ADSs and when the NYSE delisted them.

Case 1:25-mc-00235-KHP    Document 17-1    Filed 08/08/25    Page 56 of 88

| Date | Counterparty | Fang ADSs | Fang Class A | Purchase Price |
|---|---|---|---|---|
| 7/16/2021 | Lupin Capital Fund I, L.P. | 109,608 | | $1,303,239.00 |
| 12/23/2021 | First Island Trustees (Guernsey) Limited | | 94,116 | $39,526.00 |
| 1/25/2022 | Chuang Xi Capital Holdings Limited | 47,788 | | $278,604.04 |
| 1/25/2022 | Clever Sight Limited | 340,736 | | $1,986,490.88 |
| 1/25/2022 | IDG Alternative Global Limited | 48,000 | | $279,840.00 |
| 1/25/2022 | IDG-Accel China Capital Investors L.P. | 9,769 | | $56,953.27 |
| 1/25/2022 | IDG-Accel China Capital L.P. | 211,606 | | $1,233,662.98 |
| 1/26/2022 | Safari | | 2,461,538 | $1,435,078.00 |
| 5/10/2022 | Fidelidade - Companhia de Seguros, S.A. | 277,734 | | $1,374,783.30 |
| 5/10/2022 | Peak Reinsurance Company Limited | 50,885 | | $251,880.75 |
| 5/16/2022 | HHLR Fund, L.P.; YHG Investment, L.P. | 886,443 | | $4,387,892.85 |
| | TOTAL | 1,982,569 | 2,555,654 | $12,627,951.07 |

The purchased Fang ADSs represented ten Class A shares each at the time, meaning that these acquisitions equated to 22,281,344 Fang Class A shares (representing 33.90% of outstanding Fang Class A shares and 24.77% of total outstanding Fang equity). By using ACE to make these acquisitions, Defendant Mo increased his and his affiliates' ownership of Fang Class A shares by *over 550%*.

127.    Defendant Mo and his wholly owned affiliate alter ego, ACE, would have been forced to pay significantly more for those Fang interests had Fang been current with its financial reporting and not faced NYSE delisting. Defendant Mo's January 2022 and May 2022 purchases priced Fang ADSs at $5.83 and $4.95, respectively, which were at a premium to the artificially depressed trading prices of Fang ADSs at that time those purchases were made. But those purchase prices were still a significant discount from where Fang ADSs had traded earlier. Before Defendant Mo caused Fang to cease financial reporting and to fail to file its required annual reports, Fang ADSs traded at $12.50 on March 31, 2021. Similarly, from the date of Fang's reverse split in June 2020 through March 2021, Fang's ADS never closed below $9.90 per ADS, while typically trading in the $10 to $15 range and averaging around $12.20 per ADS. And even those prices were

Case 1:25-mc-00235-KHP    Document 17-1    Filed 08/08/25    Page 57 of 88

artificially depressed relative to the intrinsic value of Fang's business because of Defendant Mo's systemic prior self-dealing.

128.    Not only did Defendant Mo and his wholly-owned alter ego, ACE, benefit from scooping up Fang ADSs on the cheap, they further benefitted themselves by doing so outside of the permissible trading windows under Fang's insider trading policy. Defendant Mo's amended Schedule 13D filing with the SEC dated February 4, 2022, signed by Defendant Mo on behalf of himself and ACE, expressly admitted that ACE's purchases of Fang securities in December 2021 and January 2022 were "not made during a trading window as provided in [Fang's] Insider Trading Policy." Defendant Mo's amended Schedule 13D dated May 24, 2022, again signed by Defendant Mo on behalf of himself and ACE, likewise admitted that ACE's purchase of Fang securities in May 2022 were "not made during a trading window as provided in the Issuer's Insider Trading Policy." While both of those filings attempted to brush that aside by claiming that "a waiver from the Compliance Officer of [Fang] was obtained for the purchase[s]," that only goes to show that Defendant Mo was able to buy huge chunks of Fang securities outside of permissible trading windows due to his dominion and control over Fang and ability to procure purported "waivers" for his benefit at whim.

129.    Moreover, Defendant Mo's actions specifically violated Fang's code of conduct (which was incorporated by reference into its registration statements and annual reports with the SEC). Specifically, Fang's code of conduct specifically prohibits officers and directors for using corporate information for personal gain, and further provides that:

> *Any* employee, *director* or officer *who has access to, or knowledge of, material non-public information from or about the Company is prohibited from buying, selling or otherwise trading in our stock or other securities of our Company*. "Material non-public" information includes any information, positive or negative, that has not yet been made available or disclosed to the public and that might be of

Case 1:25-mc-00235-KHP    Document 17-1    Filed 08/08/25    Page 58 of 88

significance to an investor, as part of the total mix of information, in deciding whether to buy or sell stock or other securities of the Company.

*Such insiders also are prohibited from* giving "tips" on material non-public information, that is, *directly or indirectly disclosing such information to any other person, including family members*, other relatives and friends, so that they may trade in our stock or other securities. Furthermore, if, during the course of service with the Company, any employee, director or officer acquires material non-public information about another company, such as one of our customers or suppliers or our affiliates, or learns that the Company is planning a major transaction with another company (such as an acquisition), the employee, director or officer is restricted from trading in the securities of the other company.

(Emphasis added). Defendant Mo brazenly disregarded those prohibitions by buying huge tranches of Fang ADSs and shares when he knew material non-public information, such as Fang's financial condition and recent financial results, that Fang faced no legitimate questions over it is ability to continue as a going concern (notwithstanding misleading, contrary assertions in filings signed by Defendant Mo and his loyal nephew, Defendant Dai), and that Defendant Mo and Defendant Dai would soon be using Fang to take CIH private.

130.    Relatedly, Defendant Mo (through his affiliate ACE) and Defendant Dai (through his affiliate True Knight) also procured over 20.47 million of CIH ADSs or CIH Class A shares from ten of those selling Fang investors. They did so both to capitalize on artificially deflated prices and thin trading volumes that were a direct result of their prior misconduct, and to position themselves to take CIH private shortly thereafter.

131.    Defendant Mo, through his affiliate ACE, made the following purchases of CIH ADSs and CIH Class A shares from the exiting Fang shareholders:

| Date | Counterparty | CIH Class A | CIH ADS | Total Paid |
|---|---|---|---|---|
| 07/06/21 | Lupin Capital Fund I, L.P. | | 1,096,086 | $2,279,859.00 |
| 12/31/21 | First Island Trustees (Guernsey) Limited | 94,116 | | $93,175.00 |
| 05/24/22 | Fidelidade — Companhia de Seguros, S.A. | 1,613,208 | | $1,532,547.60 |
| 05/31/22 | HHLR Fund, L.P. and YHG Investment, L.P. | | 8,866,511 | $8,423,185.45 |
| | **TOTAL** | **1,707,324** | **9,962,597** | **$12,328,767.05** |

Each CIH ADS represents one CIH Class A share, and thus these acquisitions totaled 11,669,921 CIH Class A shares, or a 12.9% interest in CIH. The last three of these transactions fell outside of the permissible trading window under CIH's insider trading policy, but Defendant Mo purports to have obtained a waiver from CIH's compliance officer.

132.    Defendant Dai, through his wholly owned affiliate True Knight, made the following purchases of CIH ADS and CIH Class A shares from exiting Fang shareholders:

| Date | Counterparty | CIH Class A | CIH ADS | Total Paid |
|---|---|---|---|---|
| 04/30/22 | Chuang Xi Capital Holdings Limited | - | 459,123 | $436,166.85 |
| 04/30/22 | Clever Sight Limited | - | 3,273,609 | $3,109,928.55 |
| 04/30/22 | IDG Alternative Global Limited | - | 480,000 | $456,000.00 |
| 04/30/22 | IDG-Accel China Capital Investors L.P. | - | 93,869 | $89,175.55 |
| 04/30/22 | IDG-Accel China Capital L.P. | - | 2,033,003 | $1,931,352.85 |
| 04/30/22 | Safari Group Holdings Limited | 2,461,538 | - | $2,338,461.00 |
| | **TOTAL** | **2,461,538** | **6,339,604** | **$8,361,084.80** |

The total purchased equates to 8,801,142 CIH Class A shares, or a 9.7% interest in CIH. Defendant Dai caused True Knight to make these purchases outside of the permissible trading window under CIH's insider trading policy, but Defendant Dai claimed to have received a waiver of that violation from CIH's compliance officer.

133.    The (a) dark cloud over Fang from its failure to disclose its financial results and its delayed securities filings and potential NYSE delisting; (b) the Fang investors' exits from their Fang positions, and (c) Defendant Mo's and Defendant Dai's purchases of CIH interests from those Fang investors were inextricably linked and intertwined.

134.    All of Defendant Mo's and Defendant Dai's affiliates' purchases of Fang and CIH CIH interests were made after Fang failed to timely file its annual report and announced on May 24, 2021 that it was in communication with the NYSE over the threat of delisting of Fang ADSs. Similarly, all such purchases were made after Fang's last public disclosure of any financial results on March 26, 2021.

135.    Moreover, eight of the ten purchases of Fang interests occurred within three months of Fang's deadline of April 25, 2022 to cure its violation of the NYSE Rules (before the NYSE extended the deadline to May 17, 2022). ACE or True Knight purchased CIH ADSs and CIH Class A shares from all eight of the selling Fang investors on or after April 30, 2022, after Fang had announced on April 25, 2022 that is cure deadline had been extended to May 17, 2022. And two of those eight investors purchases of CIH interests by ACE were made after Fang's ADS was suspended by the NYSE in May 2022 (but before its delisting on June 2, 2022).

136.    Finally, Defendant Mo's affiliate ACE purchased Fang ADSs or Fang Class A shares within days of when five of ten Fang investors also sold CIH ADSs or CIH Class A shares to ACE or True Knight (Defendant Dai's affiliate). And while there was a slight three-month time lag for five of the other investors, those investors were also holders or affiliates of holders of 2022 Notes, and they all sold their CIH interests on April 30, 2022, right after Fang had announced an extension of its cure deadline from April 25, 2022 to May 17, 2022.

137.    Thus, the timing of these transactions was not merely coincidental. Rather, Defendant Mo and Defendant Dai were able to obtain large numbers of CIH securities representing 12.9% and 9.7% ownership in CIH, respectively, precisely because of their actions in causing Fang's failure to timely file its securities filings and Fang's resulting NYSE delisting. They made most of these acquisitions outside of the normal trading windows provided for in Fang's and CIH's respective insider trading policies. And all the purchases that ACE and True Knight made during 2022 were made for a price of just $0.95 per CIH ADS/CIH Class A share, far less than the fair value of those interests in CIH for the reasons discussed below.

138.    Defendant Mo and Defendant Dai breached their duties of good faith and loyalty to Fang by causing its NYSE delisting without legitimate justification, but rather so that they could

Case 1:25-mc-00235-KHP    Document 17-1    Filed 08/08/25    Page 61 of 88

scoop up huge stakes of Fang and CIH equity at steep discounts and while in possession of material

non-public information regarding Fang's financial condition and performance and its ability to

continue as a going concern (and indeed, serve as "sponsor" for a take private transaction involving

CIH). And in addition to acquiring large stakes in Fang and CIH on the cheap, they further

benefitted by consolidating their control over Fang and CIH, thereby facilitating the take private

transaction they would pursue just a few short months later.

### C.    Defendant Mo and Defendant Dai Cause Fang to Buy Out Minority Holders in CIH, Enabling Them to Take CIH Private Without Paying a Dime Themselves.

139.    On August 23, 2022, Defendants Mo and Dai caused Fang to submit a preliminary,

non-binding proposal to take CIH private at a price of $0.84 per CIH share or CIH ADS, to be

financed with Fang's cash on hand. Over the ensuing months, Fang, Defendant Mo, Defendant

Mo's affiliates, Defendant Dai's affiliates, along with three additional collaborating large Fang

and CIH shareholders, including Evenstar (collectively, the "Buyer Group") formed a

"Consortium," or buyer group, to participate in the transaction along with Fang.

140.    The Buyer Group eventually increased the purchase price to $1.00 per CIH share

or CIH ADS, but refused to go any higher, rejecting requests from CIH's representatives in the

transaction to offer a higher purchase price. On December 22, 2022, the terms of the take private

transaction were finalized and CIH entered into an Agreement and Plan of Merger (the "Merger

Agreement") with CIH Holdings Limited ("Merger Parent") and CIH Merger Sub Holdings

Limited ("Merger Sub"). The transaction was structured so that Merger Sub would be merged with

and into CIH through a statutory "short-form" merger in accordance with section 233(7) of the

Cayman Islands Companies Act. Following completion of the merger, CIH would cease to be a

public company and it would become a privately held, direct wholly owned subsidiary of Merger

Parent. CIH ADS holder and shareholders other than those included in the buyer group were to

receive a distribution of $1.00 per CIH ADS or share, and CIH's ADSs and Deposit Agreement with JPMorgan in New York would then be cancelled and terminated.

141.    Merger Parent, a Cayman Islands entity originally wholly owned by Fang, was a holding company formed for the purpose of holding the equity interest in Merger Sub and for implementing the merger as a means of taking CIH private. Prior to consummation of the merger of Merger Sub and CIH, each member of the buyer group (including Fang, Defendant Mo's affiliates, and Defendant Dai's affiliates) pre-committed to exchanging all their CIH securities to Merger Sub in exchange for newly issued shares of Merger Parent. As a result of these contributions, Merger Sub would have 95.0% voting power of CIH, enabling a "short-form" merger to go forward (with no shareholder vote).

142.    The obligation of each member of the Buyer Group to exchange, or "roll over," their interests in CIH in exchange for a like number of Merger Parent shares in advance of the merger was memorialized in an Equity Contribution Agreement dated December 22, 2022. Defendant Dai signed this agreement on behalf of Fang, Merger Parent, Merger Sub, and True Knight, while Defendant Mo signed the agreement on behalf ACE and each of his other affiliates that held CIH shares or CIH ADSs.

143.    The Equity Contribution Agreement was a pivotal piece of the overall deal structure. By exchanging their CIH shares and CIH ADSs to Merger Sub prior to the transaction, the Buyer Group effectively consolidated a 95% voting interest in a single entity (Merger Sub), thereby allowing a short-form merger structure with no general meeting of shareholders and no formal shareholder vote. Moreover, the agreement to "roll-over" CIH shares to Merger Sub in exchange for new shares in Merger Parent on a 1:1 basis was the only consideration paid by any of the Buyer Group members (with the exception of Fang).

144.   In effect, therefore, the Equity Contribution Agreement enabled Defendant Mo and Defendant Dai to orchestrate a take private transaction for CIH without needing to pay a dime themselves. And it further benefitted them by enabling a "short-form" merger transaction structure, which reduced execution risk, allowed them to forego a general meeting of shareholders, and reduced their litigation risk in connection with disclosures surrounding the transaction. This would not have been possible but for Defendant Dai's and Defendant Mo's utilization of Fang because Fang held a 39.0% voting interest in CIH at the time, meaning that Merger Sub would have only had a 56.0% voting interest without Fang participating as well (meaning that a short-form merger would have been impermissible).

145.   Defendant Dai and Defendant Mo also utilized Fang to facilitate the CIH take private transaction by causing Fang to provide $14.8 million in equity financing to Merger Parent to fund the buy-out of CIH's investors not participating in the transaction as members of the Buyer Group. Fang's obligation to provide this $14.8 million in equity financing was evidenced by an Equity Commitment Letter dated December 22, 2022 and signed by Defendant Dai on behalf of both Fang and Merger Parent.

146.   Finally, Defendant Dai and Defendant Mo utilized Fang to back-stop the transaction by causing Fang to give a Limited Guaranty dated December 22, 2022 in favor of CIH, signed by Defendant Dai. Under the Guarantee, Fang irrevocably and unconditionally guaranteed up to $2.2 million of obligations of Merger Parent if the deal were terminated or if Merger Parent breached its other obligations under section 9.3 of the Merger Agreement.

147.   Defendant Mo and Defendant Dai significantly benefited themselves and their affiliates by utilizing Fang as a vehicle and "sponsor" for the take private transaction of CIH. Had they not involved Fang in the transaction, then:

Case 1:25-mc-00235-KHP    Document 17-1    Filed 08/08/25    Page 64 of 88

- Defendant Mo and Defendant Dai could not have used a short-form merger structure for the take private transaction, but instead would have been subject to a shareholder vote, faced increased execution risk, and faced additional litigation risk surrounding adequacy of disclosures;

- The total payable to non-participating CIH ADS holders and shareholders would have been much higher because Fang, as a holder of a 20.0% economic interest in CIH, would have received the distribution if it had not been included as a member of the Buyer Group;

- Defendant Mo and Defendant Dai, amongst other members of the Buyers Group, would themselves have needed to fund the buy-out of non-participating CIH ADS holders and shareholders; and

- Defendant Mo and Defendant Dai would have needed some other source than the Limited Guarantee provided by Fang to backstop the transaction.

Yet because of their utilization of Fang, Defendant Mo and Defendant Dai were able to procure those benefits for themselves, and the CIH take private transaction closed on April 17, 2023.

148.    Despite those self-dealing benefits and Defendant Mo's and Defendant Dai's clear conflicts of interest, no steps were taken to protect Fang's interests in the transaction. Fang's board of directors never formed a special committee nor retained its own independent counsel or financial advisors in connection with the transaction. Moreover, CIH's Schedule 13E-3 for the transaction filed with the SEC (the "CIH Transaction Statement") specifically provides that Fang, as part of the Buyer Group, "did not consider [CIH's] net book value," "did not undertake an appraisal of the assets of [CIH]," and "did not seek to establish a pre-Merger going concern value for" CIH ADSs or shares.

149.    Accordingly, Defendant Dai breached his fiduciary duties to Fang—and Defendant Mo dishonestly assisted those breaches—by utilizing Fang as a vehicle to take CIH private for the benefit of themselves and their affiliates without regard for Fang's best interests. Moreover, that misconduct was directly facilitated and enabled by their earlier breaches of fiduciary duty to Fang.

INDEX NO. 652607/2023
RECEIVED NYSCEF: 08/18/2023

Case 1:25-mc-00235-KHP    Document 17-1    Filed 08/08/25    Page 65 of 88

150.    Specifically, the CIH take private transaction was the direct fruit of Defendant Mo's and Defendant Dai's earlier breaches of fiduciary duty in causing: (a) Fang to spin-off CIH and then shortly thereafter purchase CIH ADSs and CIH shares (including from Defendant Mo's affiliates); and (b) Fang's NYSE delisting to facilitate their affiliates' purchases of 20.47 million total CIH ADSs and CIH shares.

151.    First, at the time the take private structure was finalized, the total holdings of Fang, Defendant Mo's affiliates, and Defendant Dai's affiliate (True Knight) were as follows:

| | CIH Class A | (held as ADSs) | CIH Class B | Econ. Int. | Voting Int. |
|---|---|---|---|---|---|
| Fang | 6,964,415 | (4,534,852) | 11,119,686 | 20.0% | 39.0% |
| ACE | 11,669,921 | (9,962,597) | - | 12.9% | 3.8% |
| Karistone | - | - | 926,461 | 1.0% | 3.1% |
| Open Land | 25,000 | (25,000) | - | 0.03% | 0.01% |
| Media Partner | - | - | 5,795,802 | 6.4% | 19.1% |
| Next Decade | 14,177 | (14,177) | 5,794,757 | 6.4% | 19.1% |
| True Knight | 8,801,142 | - | - | 9.7% | 2.9% |
| *TOTAL* | *27,474,655* | *(14,536,626)* | *23,636,706* | *56.5%* | *87.0%* |

Absent Defendant Mo's and Defendant Dai's control over Fang, therefore, Defendant Mo and Defendant Dai would have only been able to muster 48.0%[7] voting power over CIH. And excluding ACE's and True Knight's voting shares (all of which were acquired during Fang's delayed securities filings and delisting) from that, their combined CIH voting share would have only been 41.3%.[8] This means that even with the other participating members of the Buyer Group, Defendant Mo and Defendant Dai would not have been able to muster even a simple majority (as the Buyer Group would have only been at 49.3%).[9]

_____

[7] 87% [total voting power] - 39% [Fang voting power] = 48%.

[8] 87% [total voting power] - 39% [Fang voting power] - 3.8% [ACE voting power] - 2.9% [True Knight voting power] = 41.3%.

[9] The other members of the Buyer Group collectively held 8.0% voting power, and 41.3% plus 8.0% equals 49.3%.

152.    Second, Defendant Mo and Defendant Dai would not have been able to utilize a "short-form" merger transaction structure had it not been for: (a) their control over Fang and Fang's large purchases of CIH ADSs and CIH shares purchases and (b) their large CIH ADS and CIH share purchases through their affiliates, ACE and True Knight during the midst of Fang's NYSE delisting. They would have come nowhere close to the 90% threshold but for Defendant Mo's and Defendant Dai's control over Fang's 39.0% voting interest in CIH.

153.    Moreover, even with the benefit of Fang's and other buyer group members' voting interests, Defendant Mo and Defendant Dai would have come up short of the 90% threshold if not for the 6.7% voting interest that ACE and True Knight obtained through purchases of CIH interests stemming from Fang's NYSE delisting. The voting total of the buyer group as a whole was 95.0%, including ACE and True Knight, and would have been 88.3% without them, falling short of the 90.0% threshold required for a "short-form" merger.

154.    Third, Fang's, ACE's, and True Knight's huge contributions to the buyer group's voting power and overall holdings facilitated the transaction because they helped justify CIH's failure to conduct a pre-signing market check or post-signing "go-shop" procedures. The CIH Transaction Statement expressly states that the special committee CIH formed to evaluate the transaction "decided not to conduct a pre-signing market check or post-signing 'go-shop' taking into account facts including that the Buyer Group, after admitting Evenstar as a member, would own in the aggregate over 90% of the total voting power and over 80% of the total outstanding share capital" of CIH. Had it not been for Defendant Mo's and Defendant Dai's earlier breaches of fiduciary duty, the buyer group would have had nowhere close to 90% voting power or 80% of total equity ownership.

Case 1:25-mc-00235-KHP    Document 17-1    Filed 08/08/25    Page 67 of 88

155.    Fourth, CIH's special committee and its corrupt fairness opinion provider, Roth

Capital,[10] utilized the $0.95 per CIH ADS or share price paid by ACE and True Knight in acquiring

CIH interests from April 2022 and May 2022 (on the eve of Fang's delisting) as additional

justification for the $1.00 per CIH ADS or share price paid in the take private transaction.

Effectively, therefore, Defendant Mo's and Defendant Dai's actions in causing Fang's NYSE

delisting (so that they could purchase CIH interests on the cheap) later benefitted them in a take

private transaction that utilized the deflated CIH purchase prices as a reference point to justify a

low-ball take private transaction.

### D.    Defendants Have Been Unjustly Enriched Through Defendant Mo's and Defendant Dai's Interrelated Breaches of Fiduciary Duty to Fang and Systemic Abuses of New York's Capital Markets.

156.    In the aggregate, the combined effect of Fang spinning-off CIH in New York,

buying back Defendant Mo's affiliates' CIH interests and other CIH ADSs on the open market in

New York, failing to make its securities filings and suffering NYSE delisting, and sponsoring a

New York-centered take private transaction to eliminate CIH ADSs and minority investors

(including those located in New York) has been disastrous for Fang. Fang depleted over $130

million to go from controlling and owning 100% of CIH to holding a 35.8% minority non-

---

[10] Roth Capital's fairness opinion, which focused solely on fairness to CIH's minority investors, was not remotely credible for many other reasons, including, but not limited to, that: (a) Roth Capital's discounted cash flow analysis was a "garbage in, garbage out" analysis based on unrealistic discount rates and on reverse-engineered financial projections prepared by CIH management that were completely unrealistic and unverified by Roth Capital; (b) Roth Capital's comparable companies analysis improperly selected unprofitable companies as comparisons for CIH, a profitable business; (c) Roth Capital's calculations were based on incorrect assumptions for CIH share counts provided by CIH management; and (d) Roth Capital's different tests for estimating enterprise value, despite financial goal-seeking, nevertheless indicated a value far higher than $1.00 per CIH ADS (*e.g.,* Roth Capital's comparable companies analysis reported median EV/EBITDA multiples at least 3 times higher than the CIH implied transaction multiple, and its precedent transaction analysis reflected an EV/EBITDA multiple 10 times higher than the implied CIH transaction multiple).

controlling interest (in a now private CIH), while at the same time Fang ADSs were delisted from the NYSE and, in turn, Fang's ability to receive proper oversight and raise future capital have been significantly hampered.

157.    Defendant Mo and his affiliates, in stark contrast, reaped huge windfalls from this interrelated series of events and Defendant Mo's consistent and repeated abuses of Fang to further his own interests at Fang's expense.

158.    First, Defendant Mo, through his wholly owned alter ego affiliate ACE, massively increased his stake in Fang. ACE's purchases of Fang ADSs and shares, all made during the time period after Fang stopped reporting its financial results and making its securities filings under threat of NYSE delisting, amounted to a 24.8% equity interest in Fang. Defendant Mo made those purchases at a steep discount to the price where Fang ADSs traded before he caused Fang to "go dark," and an even steeper discount to the fair value or intrinsic value of Fang equity because Fang ADSs already traded at an artificially deflated price due to Defendant Mo's control over Fang and disturbing track record of self-dealing.

159.    Second, Defendant Mo and his affiliates significantly increased their economic stake in CIH's business. According to the CIH Transaction Statement, Defendant Mo and his affiliates now collectively own a direct 26.7% economic interest in CIH's business through Merger Parent, as follows:

| Mo Affiliate | Post-Merger Merger Parent Int. |
|---|---|
| ACE | 12.7% |
| Karistone | 1.0% |
| Open Land | 0.0% |
| Media Partner | 6.5% |
| Next Decade | 6.5% |
| **TOTAL** | **26.7%** |

Case 1:25-mc-00235-KHP    Document 17-1    Filed 08/08/25    Page 69 of 88

They hold an additional 21.1% indirect stake in Merger Parent through Fang (as Fang holds a 35.8% post-merger interest in Merger Parent and Defendant Mo and his affiliates now own a 59.09% interest in Fang). Combined, Defendant Mo's and his affiliates' stake in CIH's business through post-merger Merger Parent is 47.8% (of which 26.7% is a direct interest). This is a significantly higher interest in CIH's business than the 34.1% indirect interest that Defendant Mo and his affiliates collectively held in that business through Fang before Fang's spin-off of CIH.

160.    Third, Defendant Mo and his affiliates pocketed tens of millions of dollars of cash. Fang paid $81.2 million to them in December 2019 and June 2020 to acquire 13.5 million CIH interests at $5.99 per share.

161.    The windfalls that Defendants received are even worse when considering the fair value or intrinsic value of ownership interests in CIH's operating business at the time that ACE and Defendant Dai's affiliate, True Knight, gobbled up nearly 10% of CIH on the cheap due to Fang's NYSE delisting. Indeed, the fair value or intrinsic value of CIH interests at that time was at least 6 to 10 times higher than the $0.95 per CIH ADS or CIH share price paid by True Knight and ACE from April 30, 2022 to May 31, 2022.

162.    At the time Defendant Mo and Defendant Dai used their wholly owned affiliates to obtain large stakes in CIH, CIH was operating a highly profitable business. Specifically, for the fiscal year ended December 31, 2021 and for the trailing twelve months ending March 31, 2022, CIH's profitability margins were as follows:

| CIH PROFITABILITY MARGINS | | |
|---|---|---|
| | *FYE 12/31/21* | *TTM Q1 2022* |
| Gross Margin | 82.3% | 82.4% |
| Operating Margin | 49.4% | 48.1% |
| EBITDA Margin | 49.6% | 48.3% |
| Net Profit Margin | 45.0% | 43.7% |

163.    During those same periods, CIH's reported key financial metrics were robust. Specifically, CIH's securities filings reflect the following (when converting figures reported in RMB to U.S. dollars):[11]

| CIH FINANCIAL PERFORMANCE | | |
|---|---|---|
| *(000's $USD)* | *FYE 12/31/21* | *TTM Q1 2022* |
| Revenue | 96,242 | 95,317 |
| Gross Profit | 79,175 | 78,550 |
| Operating Income | 47,547 | 45,833 |
| EBITDA | 47,766 | 46,055 |
| Net Income CIH (reported) | 43,271 | 41,616 |
| Earnings per share (basic) | $0.48 | $0.46 |

164.    Given that CIH's earnings per share had been in the $0.46 to $0.48 range, the $0.95 price that Defendant Mo and Defendant Dai caused their affiliates to pay for CIH ADSs and CIH shares was shockingly low at a mere two times earnings.

165.    Moreover, the $0.95 per CIH ADS or CIH share price paid implies a meager total enterprise (EV) for CIH of *only $34.3 million*,[12] when accounting for the following:

•    The $0.95 per CIH ADS or CIH share paid by Defendant Dai's affiliate True Knight in April 2022 and by Defendant Mo's affiliate ACE in May 2022 equates to a total implied equity value for CIH of $85.9 million (based on the total CIH shares and CIH ADSs outstanding of 90,425,368 as of March 31, 2022);

•    As of March 31, 2022, CIH reported 252.84 million RMB in cash and cash equivalents, and 109.56 million RMB in short-term investments. The total of 362.5 million RMB equated to approximately $57.0 million in cash, cash equivalents, and short-term investments based on the 6.3549 spot exchange rate for U.S. dollars on March 31, 2022; and

---

[11] CIH reported its financial results in RMB. The figures set forth in the table herein were derived using the Internal Revenue Service average yearly exchange rate for 2021 of 6.452, and the spot exchange rate of 6.3549 on March 31, 2022.

[12] Enterprise Value (EV) = Market Capitalization + Debt – Cash and equivalents.

Case 1:25-mc-00235-KHP    Document 17-1    Filed 08/08/25    Page 71 of 88

- CIH had no long-term term debt or notes payable, but it reported 34.71 million RMB in long-term lease liabilities as of March 31, 2022, equivalent to $5.5 million based on the spot exchange rate.

Accordingly, the enterprise value for CIH implied by Defendant Mo's and Defendant Dai's purchase price for CIH interests ($34.3 million) is *less than* CIH's EBITDA and net income over the trailing twelve-month period and as reported its most recent audited financial statements ($41.6 million to $47.8 million). Any reasonable estimate of the fair value or intrinsic value of a highly profitable operating business (with very little debt) like CIH would not be less than its operating cash flows or earnings over the preceding year.

166.    Yet, Defendant Mo and Defendant Dai acquired CIH ADSs and CIH shares at price equivalent to an implied trailing twelve-month EV/EBITDA multiple of a miniscule *0.75x*. That multiple is *at least 6 - 10 times less* than a reasonable benchmark for an EV/EBITDA multiple based on comparable companies to CIH (especially when considering CIH's strong profit margins). In turn, the fair value or intrinsic value of the CIH equity interests that Defendant Mo and Defendant Dai obtained through their affiliates was many times higher than the $0.95 per CIH ADS or CIH share they paid.

167.    Defendant Mo and Defendant Dai were only able to obtain CIH ADSs and CIH shares at such an extreme discount to the fair value and intrinsic value of equity interests in such a highly profitable business because of their egregious breaches of fiduciary duty. As described above, their breaches in causing Fang's NYSE delisting enabled them to obtain CIH interests from ten different Fang investors who also held CIH interests.

168.    Moreover, CIH ADSs traded at a significant discount to fair value as a direct result of Defendant Mo's and Defendant Dai's misconduct for several reasons.

169.    First, as a result of Defendant Mo's breaches of fiduciary duty in causing Fang to purchase his affiliates' CIH interests and to conceal that self-dealing through additional CIH ADS

purchases on the open market in New York, Fang was a large investor in CIH by 2022. Fang's large stake and financial entanglement with CIH meant that any purported uncertainty over Fang's ability to continue as a going concern cast a dark cloud of uncertainty over CIH's future prospects too. Defendant Dai directly and materially increased the extent of that risk and uncertainty by signing Fang securities filings in May 2022 that misleadingly cast doubt over whether Fang could continue as a going concern.

170.    Second, and relatedly, Defendant Mo's prior breaches of fiduciary duty to Fang had previously caused CIH to incur significant losses. Dating back to its spin-off from Fang, CIH was a guarantor on Fang's 2022 Notes. As discussed above, Defendant Mo's history of breaches of his fiduciary duties (including his self-dealing with Fang involving CIH interests) led to the Evenstar winding-up petition that caused the acceleration of the 2022 Notes. That, in turn, triggered CIH's guaranty liability, and Defendant Mo forced CIH to pay nearly $84 million to the noteholders (which CIH never recouped and wrote off as a total loss).

171.    Third, Defendant Mo and his subservient nephew, Defendant Dai, completely dominated and controlled CIH. Defendant Mo's long history of self-dealing and breaching his fiduciary duties to Fang, combined with his absolute control over CIH, created a significant risk of Defendant Mo harming CIH through future self-dealing. That risk significantly deflated the price that minority investors, who would be largely powerless to stop Defendant Mo, were willing to pay for CIH ADSs on the open market. The risk of self-dealing or diversion of CIH assets was particularly acute given that CIH and Fang shared office space, IT systems and servers, and certain members of management (such as Defendant Mo and later Defendant Dai as chairman).

172.    Fourth, CIH had continuing obligations to indemnify Fang for claims arising out of the spin-off. Defendant Mo's self-dealing in causing Fang to purchase his CIH interests so close

Case 1:25-mc-00235-KHP    Document 17-1    Filed 08/08/25    Page 73 of 88

to the spin-off and despite the stated rationale for the spin-off (as discussed above) created some risk that those indemnification obligations could be triggered.

173.    In short, the market price of CIH ADSs and shares at the time Defendant Mo and Defendant Dai gobbled them up in April 2022 and May 2022 was artificially low and deflated—relative to fair value or intrinsic value—because Defendant Mo's and Defendant Dai's prior bad acts destroyed public investor appetite for those shares, and because Defendant Mo and Defendant Dai misleadingly made Fang's plight seem far worse than it really was. In effect, therefore, Defendant Do and Defendant Dai reaped compound benefits from their misconduct by exploiting their prior misdeeds to maximize the extent of windfalls they would receive through ongoing self-interested and bad faith breaches of fiduciary duty towards Fang. It was inequitable and unjust for Defendant Mo and Defendant Dai to compound the unjust enrichment they received from prior breaches of their fiduciary duties by engaging in further breaches, and they and their affiliates should be forced to disgorge all profits received from their dealings in Fang ADSs and shares and CIH ADSs or shares and/or to pay compensatory damages to Fang.

**PLAINTIFFS' DERIVATIVE STANDING**

174.    Derivative standing in this action is related to Fang's internal affairs, as derivative standing involves the assertion of claims belonging to the company and it is an equitable right incident to ownership of Fang shares. Because derivative standing is an issue intertwined with Fang's internal affairs, derivative standing in this case is determined by Cayman Islands law, and not New York law. Cayman Islands law does not require a showing of contemporaneous ownership or demand futility, but even if it did, Plaintiffs would satisfy those requirements because Oasis obtained Fang ADSs in 2018 and has continuously owned those ADSs (before converting to registered shares), Lorelei obtained ADSs and continuously owned those ADSs (before converting to registered shares) prior to the CIH take private transaction, and Fang's directors—each of which

owe their positions to Defendants, can be removed by Defendants, and are loyal to Defendants—would not bring these claims against Defendants.

175.    Plaintiffs Oasis and Lorelei have derivative standing under Cayman Islands law because Oasis and Lorelei are registered shareholders of record of Fang and the misconduct conduct alleged herein constitutes "fraud on the minority" within the meaning of Cayman Islands law. First, Defendant Mo's and Defendant Dai's misconduct both: (a) entailed deliberate and dishonest breaches of the fiduciary duties that they owed to Fang: (a) benefited Defendant Mo and Defendant Dai. Either suffices as equitable "fraud" within the meaning of the concept of "fraud on the minority" under Cayman Islands law. Second, Defendant Mo and Defendant Dai have sufficient control over Fang to enable them to block the company from bringing these claims against them, their alter egos, and their affiliates. Defendant Mo is Fang's controlling stockholder and has over 85.1% voting power of Fang. Moreover, Defendant Mo and Defendant Dai (Fang's chairman) have exercised *de facto* control over Fang and over Fang's other directors. Plaintiffs also have derivative standing to sue ACE, True Knight, Media Partner, and Next Decade because each of those affiliates of Defendant Mo and Defendant Dai were party to or accessory to or closely associated with Defendant Mo's and Defendant Dai's breaches of fiduciary duty.

## **CAUSES OF ACTION**

### **Count I: Breach of Fiduciary Duty**
### **(Against Defendants Mo and Dai)**

176.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

177.    Defendant Mo served as a Fang director and chairman of Fang's board of directors from before the time of Fang's IPO until February 28, 2022. Defendant Dai, who previously served as a Fang officer and director, rejoined Fang's board on February 28, 2022 and has served as a

director and chairman of Fang's board of directors since then. During their tenures as Fang directors, Defendant Mo and Defendant Dai owed several fiduciary duties to Fang. Even after his supposed resignation on February 28, 2022, Defendant Mo continued to owe fiduciary duties as former director to not obtain a benefit from acts or omissions he had taken previously as a director.

178.    First, Defendant Mo and Defendant Dai owed a duty to act loyally to Fang and to act in good faith in Fang's best interests and to promote the success of Fang.

179.    Second, Defendant Mo and Defendant Dai owed a duty to use their powers as directors only for the proper purposes for which their powers were conferred.

180.    Third, Defendant Mo and Defendant Dai owed a duty to not make a personal gain from use of their fiduciary positions as Fang directors.

181.    Fourth, Defendant Mo and Defendant Dai owed a duty to avoid conflicts of interest. Relatedly, Fang's code of conduct, incorporated by reference into its registration statement with the SEC, expressly stated:

> *Business decisions must be made in the best interest of our Company, not motivated by personal interest or gain*. Therefore, as a matter of our Company policy, *all* employees, *directors* or officers *must avoid any actual or perceived conflict of interest*.
>
> A "conflict of interest" occurs when an individual's private interests interfere or conflict in any way (or even appear to interfere or conflict) with the interests of the Company as a whole. A conflict of interest situation can arise when an employee, officer or director takes actions or has interests (financial or other) that may make it difficult to perform his or her Company work objectively and effectively. Conflicts of interest also may arise when an employee, officer or director, or a member of his or her family receives improper personal benefits as a result of his or her position in the Company, regardless of whether such benefits are received from the Company or a third party. Loans to, or guarantees of obligations of, employees and their family members are of special concern. United States federal law currently prohibits the Company from making loans to directors and executive officers.
>
> It is difficult to identify exhaustively what constitutes a conflict of interest. For this reason, *every* employee, *director* or officer *must avoid any situation in which his/her independent business judgment might appear to be compromised*.

(Emphasis added).

182.    Finally, related to their duties to avoid personal gains and to avoid conflicts of interest, Defendant Mo and Defendant Dai owed fiduciary duties to:

(a) not engage in self-dealing transactions with Fang;

(b) not obtain benefits, or kickbacks, from third parties for exercising their directorial functions in a particular way; and

(c) not exploit company information for personal gain or advantage.

The last of these duties was incorporated into the prohibition of trading on material non-public information set forth in Fang's code of conduct, as alleged above.

183.    Defendant Mo breached his fiduciary duties in causing Fang to spin-off CIH, to then exercise its option to purchase back CIH shares from Defendant Mo's affiliates, and to purchase additional CIH ADSs on the open market in New York (to conceal the extent of his self-enrichment and partially offset the lost economic upside in the CIH interests his affiliates sold). Defendant Mo acted in bad faith against Fang's best interests in these transactions, as it was not in Fang's best interests to spend over $95.4 million to obtain an 18.5% non-controlling interest in an entity (CIH) that had been its wholly owned subsidiary just one year before (after Fang already had disposed of over $19.9 million in the spin-off itself). Moreover, Defendant Mo placed himself in a conflicted position, and reaped a substantial windfall and gain from self-dealing because Fang paid far more than the prevailing market price for his affiliates' CIH securities. And Defendant Mo orchestrated these transactions for an improper purpose of enabling him to raise cash while retaining full control over CIH's operating business (by virtue of his control over Fang).

184.    Defendant Mo further breached his fiduciary duties in causing Fang to cease all financial reporting after March 2021, to fail to file its required Form 20-F annual reports from May 2021 onwards, and to obtain extensions of cure deadlines from the NYSE—so Defendant Mo could

buy Fang and CIH securities on the cheap—yet still have Fang's ADSs delisted. "Going dark," losing future access to New York's capital markets and financial reporting was not in Fang's best interest, but Defendant Mo caused Fang to do so anyway so for improper purposes and to benefit himself by concealing his prior self-dealing and to enable his and his nephew's affiliates to obtain Fang securities and CIH securities at artificially depressed prices. As a result of Defendant Mo's bad faith, acting for improper purposes, conflicts of interest, and self-dealing, his wholly owned affiliate ACE obtained a 24.8% stake in Fang and a 12.9% stake in CIH at artificially deflated prices resulting from Defendant Mo's own misconduct.

185.    In obtaining a 24.8% stake in Fang for ACE, Defendant Mo breached his fiduciary duties further still by trading on material non-public information. When causing ACE to acquire Fang ADSs and shares at a steep discount, Defendant Mo was fully aware of Fang's recent and current financial condition and performance (which had not been disclosed in the marketplace since March 2021), knew that Fang faced no real threat from the winding-up petition (due to the July 2021 consent order), knew that the 2022 Notes had been repaid in full by November 2021, and knew that there were no legitimate questions over Fang's ability to continue as a going concern (despite contrary representations in securities filing signed by Defendant Mo and his nephew, Defendant Dai). Indeed, Defendant Mo was responsible for creating an informational vacuum in the marketplace that he later exploited. Defendant Mo's purchase of a massive 24.8% stake in Fang, through ACE, was motivated in whole or part by his knowledge of Fang's true financial performance and condition, and that Fang would continue as a going concern.

186.    Defendant Dai likewise breached his fiduciary duties in causing Fang to fail to disclose its financial results, to fail to file its required Form 20-F annual reports, and to obtain extensions of cure deadlines from the NYSE—so Defendant Dai and his uncle, Defendant Mo,

Case 1:25-mc-00235-KHP    Document 17-1    Filed 08/08/25    Page 78 of 88

could buy CIH securities on the cheap—yet still have Fang's ADSs delisted. "Going dark" and losing future access to New York's capital markets was not in Fang's best interest, but Defendant Dai caused Fang to do so anyway so for improper purposes and to benefit himself and his uncle by concealing Defendant Mo's prior self-dealing and facilitating his and his uncle Mo's scheme to obtain Fang and CIH securities at artificially depressed prices. As a result of Defendant Dai's bad faith, acting for improper purposes, conflicts of interest, and self-dealing, Defendant Dai's wholly owned affiliate True Knight obtained a 9.7% stake in CIH.

187.    Defendant Dai further breached his fiduciary duties to Fang by exploiting Fang—with the assistance of Defendant Mo—as a vehicle for a take private transaction involving CIH. Despite having recently signed Fang securities filing suggesting that questions persisted over whether Fang could continue as a going concern, Defendant Dai, acting in concert with his uncle Mo, caused Fang to provide $14.8 million in equity financing, to commit to roll-over its CIH interests (which Fang held as a result of Defendant Mo's earlier breaches of fiduciary duty), and to incur a $2.2 million guaranty liability, all so Defendant Dai and Defendant Mo could take CIH private without needing to pay a dime themselves and while utilizing a beneficial, short-form merger structure. Defendant Dai acted in bad faith against Fang's best interests, acted for the improper purpose of benefitting himself and his uncle, and exploited his conflict of interest as Fang's chairman for personal gain—via True Knight—in orchestrating the take private transaction.

188.    Defendant Mo and Defendant Dai obtained massive windfalls through their breaches of fiduciary duty. Defendant Mo procured $81.2 million in cash from Fang for his affiliates (Media Partner and Next Digital), obtained a 12.9% interest in CIH (via ACE) for a fraction of what that interest was worth, and likewise obtained a 24.8% in Fang (via ACE) at a steep discount, all while increasing his control over both Fang and CIH. Defendant Dai obtained a

Case 1:25-mc-00235-KHP    Document 17-1    Filed 08/08/25    Page 79 of 88

9.7% interest in CIH (via True Knight) at a price that was a small fraction of the intrinsic value or fair value of those equity interests. Accordingly, Defendant Mo and Defendant Dai should be forced to account for all profits that they and their respective affiliates receive from the acquired CIH shares (and resulting Merger Parent shares) and to disgorge all such profits. Moreover, the Fang and CIH ADSs and shares obtained by ACE, and the CIH ADSs and shares obtained by True Knight, along with subsequently acquired Merger Parent shares obtained in connection with those CIH ADSs and shares, should be held in constructive trust.

189.    Defendant Mo's and Defendant Dai's serial breaches of their fiduciary duties caused Fang to suffer tens of millions of dollars of damages in an amount to be proven at trial. In paying $5.99 per share for CIH interests acquired from Defendant Mo's affiliates and transferring $81.2 million to them, Fang paid far more than the prevailing market price at the time of those transactions. Fang lost $19.9 million in cash in connection with the CIH spin-off, spent $14.2 million in buying CIH ADSs to conceal purchases from Defendant Mo's affiliates (in addition to the $81.2 million transferred to Defendant Mo's affiliates), spent an additional $177,720 buying CIH ADSs in May and June 2022, advanced $14.8 million to fund the CIH take private, and incurred millions of dollars of professional fees in these CIH-related transactions, all to end up with a 35.8% minority interest in CIH compared to the 100% controlling interest it held in CIH before these transactions. As a direct, proximate, and foreseeable result of Defendant Mo's breaches of fiduciary, Fang was also forced to incur millions of dollars in professional fees in connection with the winding-up petition, resolution of the 2022 Notes, and correspondence with the NYSE (and associated securities filings) surrounding Fang's delisting.

Case 1:25-mc-00235-KHP    Document 17-1    Filed 08/08/25    Page 80 of 88

## Count II: Dishonest Assistance
### (Against Defendants Mo, ACE, and True Knight)

190.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

191.    Defendant Dai owed fiduciary duties to Fang.

192.    Defendant Dai breached his fiduciary duties to Fang by causing Fang's NYSE delisting so that Defendant Dai and Defendant Mo could obtain CIH ADSs and shares at a massive discount to fair value, and by subsequently exploiting Fang in the CIH take private transaction to benefit himself and Defendant Mo.

193.    Defendant Mo dishonestly assisted, or aided and abetted, in those breaches of fiduciary duty after Defendant Mo resigned as Fang's chairman of the board and was replaced by Defendant Dai in that role.

194.    Defendant Mo induced and assisted in Defendant Dai's breaches of fiduciary duty by acting in concert with Defendant Dai in those transactions. Defendant Mo, as Fang's controlling stockholder, installed his loyal nephew (Defendant Dai) to help him carry out his plan to make Fang "go dark" and use Fang's impending NYSE delisting as a vehicle to pick up CIH ADSs and shares at a steep discount. In late January 2022, Defendant Mo, through ACE, bought out the Fang positions of six Fang investors. Just one month later, Defendant Mo stepped down and installed Defendant Dai, who then (via True Knight) bought all CIH positions from those same six investors in April 2022. Defendant Mo induced and worked in concert with his loyal nephew Defendant Dai in these transactions.

195.    Defendant Mo, through his affiliates, also induced and assisted Defendant Dai's breaches of his fiduciary duties to Fang in connection with the CIH take private transaction. Defendant Mo acted in concert with Defendant Dai in developing the transaction structure, which

Case 1:25-mc-00235-KHP    Document 17-1    Filed 08/08/25    Page 81 of 88

required Fang to provide all funding while neither Defendant Mo nor Defendant Dai needed to contribute any cash. Thereafter, Defendant Mo caused his affiliates to participate in the CIH take private transaction as members of the Buyer Group and as "roll-over shareholders" who pre-committed to the merger, enabling a short-form merger structure to be utilized.

196. Defendant Mo acted dishonestly in connection with Defendant Dai's breaches of fiduciary duty. Defendant Mo knew of—and had helped orchestrate—the corrupt scheme to cause Fang to "go dark" and suffer NYSE delisting so that Defendant Mo and Defendant Dai could benefit themselves by obtaining large stakes in CIH at undervalue. Defendant Mo similarly knew of—and helped orchestrate—the self-serving transaction structure for the CIH take private transaction.

197. As a result of his dishonest assistance of Defendant Dai's breaches of fiduciary duty (and of Defendant Mo's prior misconduct), Defendant Mo (via ACE) was able to procure additional Fang ADSs and CIH ADSs and shares, all at a steep discount, in May 2022. All profits that Defendant Mo receives in connection with those Fang ADSs and CIH ADSs and shares should be disgorged.

198. Moreover, Defendant Mo's dishonest assistance of Defendant Dai's breaches of fiduciary duty (and of Defendant Mo's prior misconduct) caused damages to Fang in an amount to be proven at trial related to Fang's NYSE delisting and costs associated with the CIH take private transaction.

199. Pleading in the alternative to the extent that ACE is not deemed Defendant Mo's alter ego (Count III), ACE also dishonestly assisted, or aided and abetted, Defendant Dai's breaches of his fiduciary duties. ACE assisted in those breaches because: (a) ACE was the entity that purchased Fang ADSs and shares from the six Fang investors who then relatedly sold CIH

ADSs and shares to Defendant Dai's entity, True Knight; and (b) ACE participated in the CIH take private transaction. ACE acted dishonestly in providing that assistance because ACE, as an entity that is wholly owned and controlled by Defendant Mo, is imputed with all of Defendant Mo's knowledge and intent. Accordingly, ACE should be forced to disgorge all profits it receives from the Fang ADSs and shares and CIH ADSs and shares that ACE obtained in connection with ACE's knowing and dishonest participation in Defendant Dai's breaches of his fiduciary duties, and ACE should be held jointly and severally liable for any damages Fang suffered in connection with the CIH take private transaction.

200.    Pleading in the alternative to the extent that True Knight is not deemed Defendant Dai's alter ego (Count IV), True Knight also dishonestly assisted, or aided and abetted, Defendant Dai's breaches of his fiduciary duties. True Knight is wholly owned and controlled by Defendant Dai, and thus True Knight is imputed with Defendant Dai's knowledge and intent. True Knight participated in Defendant Dai's breaches of fiduciary duty as the entity that acquired CIH ADSs and shares from selling investors in April 2022 in connection with Fang's NYSE delisting, and as a participant in the CIH take private transaction. Accordingly, True Knight should be forced to disgorge all profits it receives from the CIH ADSs and shares it acquired in April 2022 in connection with Defendant Dai's breaches of his fiduciary duty, and it should be held jointly and severally liable for any damages Fang suffered in connection with the CIH take private transaction.

### Count III: Alter Ego
### (Against Defendants Mo and ACE)

201.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

202.    Defendant Mo wholly owned ACE and exercised complete domination and control of ACE.

Case 1:25-mc-00235-KHP    Document 17-1    Filed 08/08/25    Page 83 of 88

203.    Defendant Mo, as ACE's sole owner, necessarily benefitted from ACE's dealings, and ACE is the tool that Defendant Mo utilized to help carry out his self-enrichment scheme surrounding Fang's NYSE delisting. Mo exercised his dominion and control of ACE to use it to purchase Fang and CIH ADSs and shares at grossly deflated prices resulting from Defendant Mo's breaches of fiduciary duty in causing Fang to "go dark," causing Fang's NYSE delisting, and exploiting material non-public information.

204.    As a result of Defendant Mo's exercise of dominance and control of ACE and his utilization of ACE as a tool in his self-enrichment scheme, ACE procured large stakes in both Fang and CIH at steep discounts to fair value. All profits that ACE receives in connection with those Fang and CIH interests (and resulting Merger Parent interests) should be disgorged to Fang. Moreover, Fang was harmed as a result of "going dark" and its NYSE delisting and suffered damages in an amount to be proven at trial.

## Count IV: Alter Ego
### (Against Defendants Dai and True Knight)

205.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

206.    Defendant Dai wholly owned True Knight and exercised complete domination and control of True Knight.

207.    Defendant Dai, as True Knight's sole owner, necessarily benefited from True Knight's dealings, and True Knight is the tool that Defendant Dai utilized to help carry out his and his uncle Mo's self-enrichment scheme surrounding Fang's NYSE delisting. Dai exercised his domination and control of True Knight to use it to purchase CIH ADSs and shares at grossly deflated pricing resulting from Defendant Dai's breaches of fiduciary duty in causing Fang to "go dark" and causing Fang's NYSE delisting.

208.    As a result of Defendant Dai's exercise of dominance and control of True Knight and his utilization of True Knight as a tool for self-enrichment, True Knight procured large stakes in CIH at steep discounts to fair value. All profits that True Knight receives on account of those shares and subsequently acquired Merger Parent shares should be disgorged to Fang. Moreover, Fang has been harmed as a result of "going dark" and its NYSE delisting and suffered damages in an amount to be proven at trial.

### Count V: Dishonest Assistance
### (Against Defendants Media Partner and Next Decade)

209.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

210.    Defendant Mo owed fiduciary duties to Fang.

211.    Defendant Mo breached his fiduciary duties to Fang by causing Fang to spin-off CIH and issue CIH shares to his affiliates, including Media Partner and Next Decade, and then buy those same CIH shares back from his affiliates at $5.99 per share.

212.    Media Partner and Next Decade participated in and assisted, or aided and abetted, Defendant Mo's breaches of fiduciary duty to Fang because they are the entities that sold CIH shares to Fang at a price of $5.99 at a time when Fang could and did buy CIH interests on the open market in New York for much lower prices. In other words, Media Partner and Next Decade were the tools that Defendant Mo utilized in carrying out this scheme in breach of his fiduciary duties to Fang.

213.    Media Partner and Next Decade acted dishonestly in participating in and assisting in Defendant Mo's breaches of fiduciary duty in these transactions. Defendant Mo's knowledge and intent are imputable to those entities, as Defendant Mo dominated and controlled them. Various securities filings signed by Defendant Mo expressly admit and acknowledge that

Case 1:25-mc-00235-KHP    Document 17-1    Filed 08/08/25    Page 85 of 88

Defendant Mo controls Media Partner and Next Decade. And while several filings list Defendant Mo's wife, Jing Cao, as a director of those entities, Jing Cao has admitted in sworn declarations that she signed documents on behalf of Media Partner and Next Decade at Defendant Mo's instruction and while knowing little about the transactions.

214.     Media Partner and Next Decade profited from participating in Defendant Mo's breaches of fiduciary duty in causing Fang to pay $5.99 per share for the CIH shares that Media Partner and Next Decade transferred to Fang as part of Defendant Mo's scheme. Moreover, those transactions harmed Fang and caused damages in an amount to be proven at trial.

### Count VI: Knowing Receipt
### (Against Defendants Media Partner and Next Decade)

215.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

216.     Fang's assets, including its cash reserves, were subject to fiduciary duties owed by Fang's directors. In breach of those fiduciary duties, Defendant Mo caused Fang to transfer $81.2 million of cash to Media Partner and Next Decade.

217.     Media Partner and Next Decade beneficially received $81.2 million from Fang.

218.     Media Partner and Next Decade knew that the cash they received from Fang was transferred in breach of Defendant Mo's breach of fiduciary duties to Fang. Defendant Mo dominated and controlled Media Partner and Next Decade both directly, as he has admitted in securities filings with the SEC, and indirectly through his wife, Jing Cao, who has admitted that she blindly signed documents for Media Partner and Next Decade at the instruction of her husband, Defendant Mo. Defendant Mo was the directing mind and will of Media Partner and Next Decade, and his knowledge is imputable to them. Media Partner's and Next Decade's knowledge—and

participation in breaches of fiduciary duty—makes it unconscionable for them to retain the funds they received from Fang.

219.    Accordingly, Media Partner's and Next Decade's transactions with Fang should be rescinded, and/or Media Partner and Next Decade should give restitution for the $81.2 million they received from Fang.

## NOTICE OF INTENT TO RAISE ISSUES UNDER FOREIGN LAW

220.    Pursuant to CPLR 3016 and CPLR 4511, Plaintiffs hereby give notice of their intent to raise issues under the laws of the Cayman Islands, including but not limited to, the law governing Plaintiffs' derivative standing, Defendant Mo's and Defendant Dai's duties to Fang and their breach of such duties, and Plaintiffs' claims for dishonest assistance and knowing receipt. Plaintiffs intend to offer expert testimony, documents, and other relevant material or sources to the Court to determine the foreign law at issue.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment in Fang's favor as follows:

a.    Awarding compensatory damages against Defendants, jointly and severally, to Fang in an amount to be determined at trial;

b.    Ordering the disgorgement of all profits Defendants have made or make as a result of their breaches of fiduciary duties, dishonest assistance of breaches of fiduciary duties, and/or knowing receipt of funds obtained as a result of breaches of fiduciary duties;

c.    Rescinding Fang's purchases of CIH shares from Media Partner and Next Decade, and/or ordering Media Partner and Next Decade to make restitution of the funds they received;

d.    Imposing a constructive trust over all Fang ADSs and shares obtained by ACE;

e.      Imposing a constructive trust over all CIH ADSs and CIH shares obtained by ACE and assets traceable to those interests (including, but not limited to, shares in Merger Parent and any profits thereon);

f.      Imposing a constructive trust over all CIH ADSs and CIH shares obtained by True Knight and assets traceable to those interests (including, but not limited to, shares in Merger Parent and any profits thereon);

g.      Declaring that ACE and Defendant Mo are alter egos;

h.      Declaring that True Knight and Defendant Dai are alter egos;

i.      Awarding pre-judgment and post-judgment interest;

j.      Awarding costs and attorneys' fees in an amount to be determined at the conclusion of this lawsuit; and

k.      Ordering such other and further relief as the Court deems just.

Case 1:25-mc-00235-KHP    Document 17-1    Filed 08/08/25    Page 88 of 88

Dated: New York, New York          Respectfully submitted,
       May 29, 2023

                                   REID COLLINS & TSAI LLP

                                   _____
                                   William T. Reid, IV
                                   Yonah Jaffe
                                   Aaron A. Brown
                                   420 Lexington Avenue, Suite 2731
                                   New York, New York 10170
                                   T: 212-344-5200
                                   F: 212-344-5299
                                   wreid@reidcollins.com
                                   yjaffe@reidcollins.com
                                   abrown@reidcollins.com

                                   Nathaniel J. Palmer (*pro hac vice to be filed*)
                                   Michael Yoder (*pro hac vice to be filed*)
                                   1301 S. Capital of Texas Hwy, C-300
                                   Austin, Texas 78746
                                   T: 512-647-6100
                                   F: 512-647-6129
                                   npalmer@reidcollins.com
                                   myoder@reidcollins.com

                                   *Counsel for Plaintiffs Oasis Investments II*
                                   *Master Fund Ltd. and Lorelei NCC Inc.*